[Crim. No. 24307. Oct. 9, 1986.]

In re BARBARO ESCOBEDO ARIAS et al. on Habeas Corpus.

670

672

## COUNSEL

Robert N. Chargin, Public Defender, and David Wellenbrock, Deputy Public Defender, for Petitioners.

Margaret C. Crosby, Alan L. Schlosser and Amitai Schwartz as Amici Curiae on behalf of Petitioners.

John K. Van de Kamp, Attorney General, and J. Robert Jibson, Deputy Attorney General, for Respondent.

## OPINION

**BIRD, C. J.**—Does the installation of bugging equipment in the chapel complex of a Youth Authority facility violate the religious freedom or privacy rights of Youth Authority wards?

### I.

 Petitioner Arias was a ward of the Youth Authority (YA) at the Karl Holton School, Northern California Youth Center.[1] From time to time, petitioner participated in religious services held in the Protestant chapel. These services include: (1) worship, (2) music and art, (3) bible studies, (4) prayers and auricular confessions, (5) individual spiritual counselling, and (6) group counselling. Some of these activities, such as worship, are group activities open to the entire Karl Holton School community. Others, such as confessions and counselling, are conducted privately between the chaplain and individual wards.

The Protestant chapel complex consists of a large room that serves as the chapel, various smaller rooms, and a foyer (or "vestibule") located between the chapel and the doors leading outside. On one side of the foyer is a restroom, and on the other, the chaplain's office. Worship services are held exclusively in the chapel, while confessions and private counselling sessions are conducted in the chapel, the foyer, or the chaplain's office.[2]

In July or August of 1982, as part of its plan to improve security,[3] the YA updated electronic surveillance throughout the Karl Holton School and

---

[1] Neither petitioner is currently in custody at the Karl Holton School. Petitioner Arias is currently on parole. Petitioner Bolton was on parole until March 6, 1986, his 25th birthday, when the YA's jurisdiction expired. Accordingly, this case is technically moot. However, since the issues presented here are matters of public concern and continue to occur, "this court exercises its inherent discretion to guide the courts and the [YA]." (*In re Jackson* (1985) 39 Cal.3d 464, 468, fn. 3 [216 Cal.Rptr. 760, 703 P.2d 100], see *In re William M.* 3 Cal.3d 16, 23-25 [89 Cal.Rptr. 33, 473 P.2d 737].)

[2] There is no confessional in the Protestant chapel complex.

[3] Wards are routinely accompanied by YA staff members on their way to and from the chapel. While in the chapel, wards are within sight supervision by the chaplain or another staff member. Each staff member, including the chaplain, carries an FM beeper alarm. The alarm is activated by pressing a button, which notifies security personnel that a problem exists.

installed an "electronic listening device"—a microphone—in the Protestant chapel complex.[4] The microphone is located in the ceiling of the foyer, and is designed to monitor sounds in the foyer and in all of the surrounding areas, including the chapel and the chaplain's office.[5] To this end, the doors between the chapel and the foyer are to remain open at all times.

The microphone has been installed but the wires have not been connected. The YA intends to connect the microphone by wires to a "control center."

Ronald R. Lowry, chief of the YA Facilities Planning Bureau, described in an affidavit how the electronic sound security system at the school is intended to operate. Sixty microphones, including the chapel microphone, have been "strategically" placed throughout the school. The microphone inputs are grouped into 15 monitoring channels, 1 channel for each dormitory unit, serving kitchen, gymnasium, and chapel complex. The microphones monitor sound throughout the facility.

As Lowry explained, the system serves its security function in two ways: first, it acts as an alarm system. A preset noise-level (decibel) threshold is established for each of the 15 channels. Operators in the main control room manually set a threshold level for each channel by turning a dial. When the noise level in a given location reaches or exceeds the threshold level for only a moment, a warning light is illuminated in the control center. When the threshold level is reached or exceeded for a longer period, or when two or more momentary intrusions at or above the threshold level occur within a prescribed period, the system illuminates a warning light and activates the control room speaker, enabling YA personnel to listen to the sounds in the particular location.

Another security objective, Lowry explained, is "information gathering." Once a noise of sufficient loudness and duration or repetition activates the control room speaker, the control room staff listen to the sounds coming from the signal area. If the staff discovers that a security problem exists,

---

[4] Prior to this installation, no electronic listening device existed in the chapel complex.

Although this petition technically involves only the Protestant chapel, the parties agree that a listening device is also planned for the Catholic chapel.

[5] The decision to place the microphone in the foyer was made after less successful tests were done with the microphone attached to a light fixture in the sanctuary. (See *post,* at p. 675.) The chapel foyer is roughly 19 feet wide by 144 feet deep. The microphone is located near the center of the foyer ceiling. The chapel itself is approximately 44 feet by 40 feet, with an 18-foot high ceiling. The doors separating the foyer from the chapel are approximately 7 feet from the microphone.

The chaplain's office is adjacent to the foyer and is approximately 11 feet by 12 feet. The foyer microphone is slightly more than 10 feet from the chaplain's office door—the distance an average adult travels in 3 or 4 steps.

they transmit this information to security personnel via two-way radio so that appropriate action may be taken.

The Protestant chapel microphone is monitored on a separate channel. Thus, its threshold level can be adjusted separately. This threshold is supposed to be set just above the "ambient noise level," i.e., just above the level of "background" noise so that only "loud" rather than "routine" noises will trigger the control room speaker.

Apparently, the determination as to what the threshold level will be is left to the discretion of control-room personnel. Neither party has produced any guidelines that would prevent the level from being set so that a conversation at normal speaking level would trigger the alarm and speaker. At oral argument, counsel for the YA explained only that the incentive for monitoring chapel conversations is diminished by the fact that activation of the control room speaker by one channel effectively prevents monitoring of other channels covering the rest of the Karl Holton facility. Nevertheless, the existence of a microphone in the chapel renders it possible for staff to monitor conversations there which occur at levels below that of a normal speaking voice.

The chapel microphone can be turned off at the chaplain's request. However, the YA retains ultimate authority to deny such a request. If a request is honored, security personnel are supposed to come to the chapel and turn off the device. Once that is done, personnel in the control room are unable to monitor sounds in the chapel. The device cannot be reactivated until security personnel return to the chapel.

The chapel monitoring system was tested in March of 1982 and again in June of 1982. The testing sought to determine the optimum microphone placement within the chapel complex and to test the threshold-setting capabilities of the control room equipment. The March test was unsuccessful due to problems with the control room equipment. While the record is somewhat unclear on this point, the apparent problem was that the control room equipment was too sensitive and the microphone input overloaded the system. Thus, the threshold levels could not be accurately adjusted.

By the time of the June test, however, new control room equipment had been installed and these problems had been solved. Microphones were placed in three locations within the chapel complex[6] and monitoring was done at four levels of ambient noise, ranging from complete silence to "loud"

---

[6]One in the sanctuary, one in the ceiling of the foyer, and one in the light fixture in the foyer. See footnote 5, *ante*.

background noise.[7] These tests determined that when the microphone was placed in the sanctuary, a loud religious service (i.e., 85 decibels) would activate the alarm system. When the microphone was placed on the ceiling of the vestibule with the chapel doors open, the system performed similarly. When the microphone was attached to the light fixture in the vestibule with the chapel doors open, loud background noise failed to trigger the alarm. From these tests, YA personnel determined that the alarm system would be useless during a loud religious service because the system would be unable to distinguish between loud "background" noise and cries for help.

Neither the March nor the June test involved any formal testing of the chapel microphone's ability to detect sound emanating from the chaplain's office. However, the Reverend Kenneth Leep, the school chaplain, testified that he had conducted informal tests in this regard. The chaplain and another person conducted a conversation in his office, first with the door open and then with the door closed. Reverend Leep then listened to a tape of the experiment in the control room. These informal experiments indicated that conversations could be heard with the door open or closed. Once the door was closed, however, the content of the conversations could not be discerned.

Reverend Leep testified that microphones were in the ceiling and on the hanging light fixture of the foyer during these tests. The record is unclear as to which one of the foyer microphone placements was utilized in these tests. The record fails to disclose the level of background noise at the time the tests were conducted, such as the operation of ventilation systems or activity in the rest of the chapel.

Lowry also offered his opinion as to the ability of the system to monitor conversations in the chaplain's office. His opinions were based on conjecture, rather than on actual testing. In his affidavit, he stated that "a microphone placed [] in the vestibule would not be able to pick up the contents of a normal conversation in the chaplain's office, provided the door between the office and the vestibule [were] closed and there [were] normal noise conditions in the chapel and in the control center." The nature of these "normal"

---

[7]As Lowry explained in his affidavit, "First a totally quiet background was used, simulating the conditions when no one is (or should be) inside [the chapel], or when the chaplain is there alone and no conversation is taking place. Second a low conversation background was used, simulating conditions when the chaplain is counselling or quietly conversing with one to three wards. Third, moderate background noise was used to simulate conditions when all ward services were being conducted in the chapel, including singing. Fourth, loud background noise was used to simulate conditions when outside groups are in attendance with wards and the activities include very loud singing and the playing of electrically amplified musical instruments."

conditions was not defined. Lowry did not offer any opinion as to the effect that "abnormal" conditions might have on the system's ability to monitor the fact or contents of a conversation.

In November of 1981, Eugene Escobedo and Donald Sowell, two wards at the Karl Holton School, filed a petition for writ of habeas corpus in the San Joaquin Superior Court. The petitioners sought to enjoin the planned installation of the electronic listening devices in the school's chapel and to declare the use of such devices violative of their rights of privacy and religious freedom under the state and federal Constitutions. They also alleged that the placement of the microphones would violate the clergy-penitent communications privilege. (Evid. Code, § 1032.) A few days later, the court issued an order to show cause and appointed counsel for the petitioners. The matter proceeded to hearing in September of 1982, a few months after the microphone had been installed.

In November of 1982, petitioners Arias and Bolton filed a petition for habeas corpus on the same grounds. Shortly thereafter, the superior court consolidated the two petitions and appointed counsel for petitioners Arias and Bolton. Following supplemental briefing, in which additional statutory claims under Penal Code sections 2600[8] and 2601 and Welfare and Institutions Code section 1705 were raised, the court denied the petition.

Noting that "[i]nstitutional security and the protection of staff in penal institutions are a paramount consideration[,]" the trial court placed the burden on the petitioners to show that the security system would be "excessively intrusive" upon their "Fourth Amendment right to privacy." The court found that the sound security system would constitute "no restriction of petitioner's religious freedom" and "would not infringe upon petitioner's religious or privacy rights." Finally, applying the standards of section 2600, the trial court found that in light of the security interests of the institution, installation of the sound security system in the chapel was "obvious[ly] . . . necessary."

Thereafter, the court denied a motion for rehearing but granted petitioners a stay to permit them to seek relief in the Court of Appeal. After the Court of Appeal summarily denied a new petition, this court issued an order to show cause returnable to that court, which again denied relief. The present proceedings followed.

---

[8]All subsequent statutory references are to the Penal Code unless otherwise indicated. The Evidence Code section 1032 claim apparently was abandoned at this stage.

Although no stay is apparently in effect at this time, the chapel microphone has not yet been activated.[9]

## II.

■ Habeas corpus may be sought by one lawfully in custody for the purpose of vindicating rights to which he is entitled while in confinement. (*In re Jordan* (1972) 7 Cal.3d 930, 932 [103 Cal.Rptr. 849, 500 P.2d 873]; *In re Harrell* (1970) 2 Cal.3d 675, 682 [87 Cal.Rptr. 504, 470 P.2d 640]; *In re Allison* (1967) 66 Cal.2d 282, 285 [57 Cal.Rptr. 593, 425 P.2d 193]; *In re Riddle* (1962) 57 Cal.2d 848, 851 [22 Cal.Rptr. 472, 372 P.2d 304].) There are significant statutory and constitutional issues regarding the status of individuals who remain in the YA's custody, even though petitioners are no longer. (See *ante,* fn. 1.) ■ Since the presence of the chapel microphone has a chilling effect on religious practices in the school, the issues are ripe for adjudication. (See *Pierce* v. *Society of Sisters* (1925) 268 U.S. 510, 534-536 [69 L.Ed. 1070, 1077-1078, 45 S.Ct. 571, 39 A.L.R. 468].)

■ However, it is well settled that habeas corpus petitioners must exhaust available administrative remedies before seeking judicial relief, even where constitutional issues are at the core of the dispute. (*In re Dexter* (1979) 25 Cal.3d 921, 925 [160 Cal.Rptr. 118, 603 P.2d 35]; *In re Muszalski* (1975) 52 Cal.App.3d 500, 503, 508 [125 Cal.Rptr. 286].)

The record does not indicate whether petitioners have pursued their administrative remedies in attempting to resolve this dispute. On the other hand, at no time during this litigation has the YA raised the issue of exhaustion. Instead, the YA has consistently evinced a desire to resolve the issue on the merits. (See *Dexter, supra,* 25 Cal.3d at p. 926.)

Furthermore, the record indicates that the trial court delayed the commencement of the order to show cause hearing so that the parties could attempt to reach a settlement regarding the religious privacy and security needs of the Karl Holton School. At present, it appears that the YA has been fully apprised of petitioners' claims and has adopted a firm stance in opposition to them. (Cf. *In re Serna* (1978) 76 Cal.App.3d 1010, 1014 [143 Cal.Rptr. 350] [further exhaustion ordered where neither the court nor prisoners knew how Director of Corrections would rule on prisoners' religious freedom claims].) In light of these considerations, further exhaustion

---

[9]During the pendency of the trial court proceedings, Sowell's petition became moot due to his release from YA. Although the custody status of petitioner Escobedo is presently unclear, he did not join petitioners Arias and Bolton in their later writ to the Court of Appeal. Therefore, the present proceeding is brought on behalf of Arias and Bolton only.

in this case would appear to be futile. The merits may be properly considered by this court.

### III.

Petitioners assert that the proposed sound system unlawfully infringes on their religious freedom and right to privacy. The religious freedom claim is based on article I, section 4 of the California Constitution, the free exercise clause of the First Amendment of the United States Constitution, Welfare and Institutions Code section 1705, and sections 2600 and 2601. The privacy claim is bottomed on article I, section 1 of the California Constitution, and sections 636, 2600, and 2601. Petitioners do not allege a violation of any federally protected privacy rights.

The statutory claims will be considered first.　■■■■　The analysis must begin with section 636. That statute does not require balancing of security needs against a prisoner's rights. Thus, if the installation of the chapel microphone violates section 636, that ends the inquiry.

Section 636, originally enacted in 1957 as section 653i, was incorporated into the California Privacy Act (Privacy Act) (§§ 630-637.5) at the time of its adoption in 1967. The purpose of the Privacy Act, as expressed therein, is "to protect the right of privacy of the people of this state" against invasion by "the use of . . . devices and techniques . . . [developed] for the purpose of eavesdropping upon private communications."

Section 636 provides that "[e]very person who, without permission from all parties to the conversation, eavesdrops on or records by means of an electronic or other device, a conversation, or any portion thereof, between a person who is in the physical custody of a law enforcement officer or other public officer, or who is on the property of a law enforcement agency or other public agency, and such person's attorney, religious advisor, or licensed physician, is guilty of a felony . . . ." Unlike other provisions which permit eavesdropping for limited purposes (see, e.g., §§ 633, 633.5), section 636 contains a flat ban on unconsented-to eavesdropping regardless of motive.[10] Accordingly, the YA may not rely on security concerns to justify its conduct. (*In re Jordan, supra,* 7 Cal.3d 930, 937-938, fn. 3, and cases cited; see *North* v. *Superior Court* (1972) 8 Cal.3d 301, 309, 312 [104 Cal.Rptr. 833, 502 P.2d 1305, 57 A.L.R.3d 155]; *People* v. *Apodaca* (1967) 252 Cal.App.2d 656, 659 & fn. 2 [60 Cal.Rptr. 782].)

---

[10]The only motive-based exception is for "employee[s] of a public utility engaged in the business of providing service and facilities for telephone or telegraph communications," who are permitted to listen in on such conversations "for the limited purpose of testing or servicing such equipment." (§ 636.)

■ Section 636 protects the rights of persons in custody to engage in private conversations with particular persons based on "the special relationship between the communicants." (*North* v. *Superior Court, supra,* 8 Cal.3d 301, 309-310; see also *In re Jordan, supra,* 7 Cal.3d 930, 937-938, fn. 3 [§ 636 prohibits "monitoring" of visits by an attorney to a prisoner].)

■ The United States Supreme Court has recognized that, "in a jail, or perhaps especially there, the relationships which the law has endowed with particularized confidentiality must continue to receive unceasing protection." (*Lanza* v. *New York* (1962) 370 U.S. 139, 143-144 [8 L.Ed.2d 384, 388, 82 S.Ct. 1218].) Section 636 represents an important part of that protection in this state.

■■ ■■■■■■ ■ Section 636 prohibits only "eavesdropping on"[11] "conversations" between a person in custody and that person's religious advisor. Notably, this language is not limited to "penitential" communications. (Compare Evid. Code, §§ 1032-1034.) Section 636 apparently takes a broader view of the role of the religious advisor in a custodial setting than

---

[11]The instant case differs from many eavesdropping cases in that the parties here are aware that they are being monitored. Many "eavesdropping" cases involve only "secret" monitoring. (See, e.g., *Ribas* v. *Clark* (1985) 38 Cal.3d 355, 359-361 [212 Cal.Rptr. 143, 696 P.2d 637, 49 A.L.R.4th 417] and cases cited therein.) Indeed, this court recently defined "eavesdropping" as "the secret monitoring of conversations by third parties." (*Ribas* v. *Clark, supra,* 38 Cal.3d at p. 359; see *Rodgers* v. *Ulrich* (1975) 52 Cal.App.3d 894, 899 [125 Cal.Rptr. 306], citing Webster's Seventh New Collegiate Dict. (1972).)

However, it is apparent from the plain language of section 636 that its ban on "eavesdropping" was not intended to carry this meaning. Section 636 requires "permission" from "all parties to the conversation" before eavesdropping may occur. If "eavesdropping" were interpreted to refer only to "secret" monitoring, the "permission" clause of the statute would be rendered virtually meaningless. A person could engage in unauthorized monitoring of a conversation merely by informing the parties rather than obtaining their permission. The statute, however, clearly requires more than mere *awareness* of monitoring. It requires *consent.* Accordingly, the statute must be read as prohibiting any *nonconsensual* monitoring of conversations between wards and the chaplain, whether they are aware of the monitoring or not.

Moreover, the recognized purpose of section 636—to guarantee to those in custody the opportunity to converse privately with their religious advisor, attorney or licensed physician— requires this construction. The privacy guarantee of section 636 would be hollow indeed if it could be effectively obliterated by posting signs proclaiming "All Conversations Monitored." The law is clear that privacy rights cannot be destroyed by the mere act of informing the parties that they are being monitored. (See *De Lancie* v. *Superior Court* (1982) 31 Cal.3d 865, 876 [183 Cal.Rptr. 866, 647 P.2d 142].)

This court has recognized section 636's protection of a prisoner's right to converse with his attorney in private on the prison grounds. (*North* v. *Superior Court, supra,* 8 Cal.3d at pp. 309-310; see also *In re Jordan, supra,* 7 Cal.3d at pp. 937-938, fn. 3.) *North* and *Jordan* clearly suggest that this protection prohibits overt as well as secret monitoring. Presumably YA wards enjoy no less protection under section 636 when they converse with their religious advisors.

The effect of awareness of monitoring under provisions of the Privacy Act which prohibit monitoring of "confidential" communications is not presented in this case; section 636 does not speak of "confidential" conversations. Nor does this opinion purport to resolve the meaning of "eavesdropping" in other contexts.

that embodied in the traditional priest-penitent privilege. "Conversations" between a ward and a religious advisor may range from traditional confessions to more informal counselling sessions; from giving encouragement when a ward is depressed to merely lending a listening ear to a ward who needs to talk. Conversations might well occur if a chaplain sees a ward praying in the chapel and approaches the ward to speak with him. All "conversations"—including those between the religious advisor and several wards in a group setting—are protected, provided that the wards are conversing with him in his capacity as religious advisor. However, section 636 apparently does not prohibit monitoring of public religious services held in the chapel. Such services are not "conversations" between a ward and his religious advisor.

The YA contends that the conditions of section 636 are met as long as the chaplain's office remains free of monitoring and, therefore, available for private conversations. However, nothing in the language of section 636 appears to require the chaplain to retreat to a specific location in the chapel to hold a conversation with a ward. On the other hand, a literal construction of the statute—prohibiting monitoring of protected conversations wherever they occur in the Karl Holton School facility—would simply be unworkable. Given the prevalence of sound monitoring throughout the facility, the goal of ensuring the privacy of the chaplain's conversations as he travels about would be well nigh impossible to achieve.

But this does not mean the chaplain must forego using areas of the chapel complex commonly used for religious counselling in order to be protected by section 636. Restricting him to a confessional or his small office would fail to adequately effectuate the intent of the statute. Accordingly, the most reasonable construction is that section 636 prohibits monitoring of conversations between a ward and his religious advisor in locations traditionally used for that purpose. (Cf., *North* v. *Superior Court, supra,* 8 Cal.3d at p. 309 [privacy of attorney-prisoner communications protected by § 636 *if* conducted in a room designated for that purpose].)

In the institutional setting, such locations would include all parts of the chapel complex used for religious counselling. Reverend Leep, Protestant chaplain at Karl Holton School, testified that he occasionally conducts religious counselling with wards in his office, but more typically, he uses the chapel foyer and the public worship area.[12] Accordingly, section 636

---

[12]See discussion *post,* at p. 693.

prohibits monitoring of conversations between a ward and his religious advisor in all of these areas of the chapel complex.[13]

The final issue for resolution is whether section 636 requires the removal of the bugging system from the chapel or whether something short of removal will satisfy the statute. Nothing in section 636 prohibits the *existence* of sound monitoring equipment. Only the *use* of such equipment for eavesdropping on protected conversations is prohibited.

The sound monitoring system is designed such that only unusually loud sounds will activate the alarm and control room speaker—*if* the controls are properly set. Thus, conversations at normal speaking levels will not be monitored in the control room if the system is not abused. However, even with proper use, the system may monitor portions of protected conversations if the participants raise their voices above normal levels.[14] Reverend Leep testified that his conversations with wards are not always conducted at normal conversation levels, and, at times, the wards can become "very emotional."[15]

---

[13]Contrary to Justice Grodin's assertion, this court does not hold that section 636's protection is determined by the "preferences" of the chaplain or ward. (See conc. and dis. opn., *post*, at p. 702.) The record shows the YA has set aside a facility within the Karl Holton School—the Protestant chapel complex—all areas of which are routinely used by the chaplain to conduct a variety of religious activities. Reverend Leep's testimony is relevant, not because it indicates which areas he prefers to use for conversations with wards, but rather because it illustrates that all areas of the chapel complex are typically used for that purpose. Section 636 provides absolute protection for such conversations in these areas.

Although Justice Grodin faults the court for citing no authority for its interpretation of section 636, he likewise cites no authority for his own construction of the statute. This court is not inclined to accept his position that section 636 protects ward-chaplain conversations only if they are confined to the chaplain's private quarters. On its face, the statute prohibits *any* monitoring of conversations between a ward and religious advisor. The court should exercise the utmost restraint in narrowing those protections in light of practical considerations. Justice Grodin's restrictive interpretation deviates from the plain language of the statute to a far greater extent than reasonably necessary to accommodate the practical considerations discussed in the text.

Finally, this opinion does not preclude the possibility that exceptional circumstances may arise where section 636 might protect ward-chaplain conversations conducted outside of the chapel complex. Such situations may occur where a ward is bed-ridden or for some other reason cannot go to the chapel complex to converse with his religious advisor. In such circumstances, section 636 may well require the YA to provide areas accessible to the ward and his religious advisor to conduct unmonitored conversations.

[14]The Privacy Act has been held to proscribe only intentional as opposed to inadvertent overhearing or interception of communications. (*People* v. *Buchanan* (1972) 26 Cal.App.3d 274, 287 [103 Cal.Rptr. 66].) YA personnel *intend* to "listen in" on any loud, persistent noise from the chapel, regardless of the source or content. On occasion, this may include an emotional conversation between a ward and the chaplain which is protected by section 636. The fact that YA personnel are not *motivated* by a desire to listen in on such conversations is irrelevant. The mere act of intentionally listening will violate the statute.

[15]This testimony is discussed in greater detail at page 693, *post*.

Of course, one means of ensuring that no monitoring will occur would be to order the removal of the system. However, the statute does not seem to require such action.

On the other hand, anything short of deactivation of the system during the course of such conversations may well result in felonious monitoring should the parties raise their voices sufficiently above a normal conversation level. Consequently, complete deactivation of the system during such conversations appears to be the only method of satisfying the commands of section 636.

In sum, this court holds that section 636 is violated whenever YA personnel monitor conversations between wards and the chaplain in the chapel complex. However, if the YA deactivates the system during such conversations, section 636 would not require removal of the chapel microphone.

This does not end the inquiry. While deactivation of the system during protected conversations may avoid the problems created by section 636, the known presence of the microphone and the potential for abuse of the system may still have a chilling effect on a ward's exercise of his or her religion. The next area appropriate for discussion, therefore, is Welfare and Institutions Code section 1705, since it specifically deals with the religious freedom rights of persons in YA custody.

Welfare and Institutions Code section 1705 provides that "[i]t is the intention of the Legislature that all persons in the custody of an institution under the supervision of the Department of the Youth Authority shall be afforded *reasonable opportunities to exercise religious freedom.*" (Italics added.) Petitioners concede that the phrase "reasonable opportunities" is "open to some interpretation," but argue that "[c]ommon sense and the tenor of American freedoms" compel the conclusion that "bugging a chapel is not affording a reasonable opportunity to exercise religious freedom."

Fortunately, there are more tangible guideposts than either "common sense" or "the tenor of American freedoms" for interpreting how the "reasonable opportunity" standard of Welfare and Institutions Code section 1705 was intended to apply in cases where the exercise of religious freedom is in conflict with institutional security concerns. The legislative history of section 1705 and judicial developments since its enactment illustrate this fact.

Welfare and Institutions Code section 1705 was enacted in December of 1972, along with two parallel statutes affording the same "reasonable opportunities" to prisoners in state and local detention facilities (§§ 4027,

5009; Stats. 1972, ch. 1349, §§ 1-2, p. 2680). This enactment occurred only nine months after the United States Supreme Court handed down its per curiam decision in *Cruz* v. *Beto* (1972) 405 U.S. 319 [31 L.Ed.2d 263, 92 S.Ct. 1079], wherein the court held that "reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendments without fear of penalty." (*Id.*, at p. 322, fn. 2 [31 L.Ed.2d at p. 268].)

The legislative history of Welfare and Institutions Code section 1705 strongly suggests that the language eventually enacted was a direct response to this holding. Assembly Bill No. 1213 was introduced in the Assembly on March 14, 1972—six days before the decision in *Cruz*. (1 Assem. J. (1972 Reg. Sess.) p. 973.) As originally introduced, the bill declared it "the intention of the Legislature that the right of prisoners to observe religious practices shall be guaranteed to them." (Assem. Bill No. 1213 (1972 Reg. Sess.) Mar. 14, 1972.)

The bill was then amended to extend protection to prisoners in local detention facilities and persons in YA custody. The amendment added, in relevant part, that the right to observe religious practices "shall not be curtailed except as it may become reasonably necessary to enforce reasonable, proper, and lawful security measures." (Assem. Amend. to Assem. Bill No. 1213 (1972 Reg. Sess.) June 19, 1972.)

The Assembly passed the amended measure and forwarded it to the Senate on June 30, 1972. There, the bill was further amended to read that persons in YA custody "shall be afforded reasonable opportunities to exercise religious freedom." (Sen. Amend. to Assem. Bill No. 1213 (1972 Reg. Sess.) Aug. 4, 1972.) The Assembly passed this amended version (5 Assem. J. (1972 Reg. Sess.) p. 7862), and the bill was signed into law on December 22, 1972. (Stats. 1972, ch. 1349, §§ 1-3, p. 2680.)

■ In light of this history and the language ultimately adopted, it is obvious that the Legislature intended Welfare and Institutions Code section 1705 to conform to the holding in *Cruz*. However, this does not mean that the Legislature explicitly rejected a "necessity" standard. A review of *Cruz* and its progeny illustrates this point.

*Cruz* was a prisoner who claimed to be a Buddhist. He filed a civil rights action (see 42 U.S.C. § 1983), alleging First Amendment violations stemming from (1) prohibitions on using the prison chapel and writing to his religious advisor, and (2) placement in solitary confinement for sharing his religious material with other prisoners. The federal district court summarily denied relief on the basis that such matters were to be left to the "sound

discretion of prison administration" and that undisclosed "security" reasons might well have prevented "the 'equality' of exercise of religious practices in prison." (See 405 U.S. at p. 321 [31 L.Ed.2d at p. 267].)

The Supreme Court rejected the lower court's approach, stating that while "courts sit not to supervise prisons," they must nevertheless "enforce the constitutional rights of all 'persons.'" (*Ibid.*) The high court went on to hold that prisoners are protected by rights guaranteed by the free exercise clause of the First Amendment. It guarantees to each prisoner "a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts." (405 U.S. at p. 322 [31 L.Ed.2d at p. 268].)[16]

Since the lower court had summarily denied relief, *Cruz* did not directly rule on how the "reasonable opportunity" standard should be applied in cases such as this one, where security concerns of the institution arguably conflict with the wards' free exercise of religious practices. However, the court did give some indication of its position on this matter.

The district court held that security concerns should *always* prevail. The Supreme Court's only response to this, albeit indirect, was to rely on an earlier decision outlawing the practice of racial segregation in prison, except when required by "'the necessities of prison security and discipline.'" (405 U.S. at p. 321 [31 L.Ed.2d at p. 268] quoting *Lee* v. *Washington* (1968) 390 U.S. 333, 334 [19 L.Ed.2d 1212, 1213, 88 S.Ct. 994].) It would appear, then, that the Supreme Court permits institutional security measures to limit a prisoner's religious freedom only when such measures are "necessary."

In the years since *Cruz,* most courts have invoked a "less restrictive means" standard in this context (see *Capoeman* v. *Reed* (9th Cir. 1985) 754 F.2d 1512, 1515; *Teterud* v. *Burns* (8th Cir. 1975) 522 F.2d 357), interpreting the high court's ruling as requiring a showing of "necessity" before security measures may limit religious expression. At least three courts of appeals have applied an "intermediate standard," upholding restraints on religious exercise only "'if the state regulation has an important objective and the restraint on religious liberty is reasonably adapted to achieving that objective.'" (*Madyun* v. *Franzen* (7th Cir. 1982) 704 F.2d 954, 960, cert. den. (1983) 464 U.S. 996 [78 L.Ed.2d 687, 104 S.Ct. 493]; see *Dreibelbis* v. *Marks* (3d Cir. 1982) 675 F.2d 579, 581 [62 A.L.R. Fed. 473]; *Burgin* v. *Henderson* (2d Cir. 1976) 536 F.2d 501, 503.)

---

[16]The court emphasized that not all religions represented in a prison—however few in number—must have equal facilities, but rather only that "reasonable opportunities" must be granted to all prisoners. (405 U.S. at p. 322, fn. 2 [31 L.Ed.2d at p. 268].)

Some courts have upheld restraints on religious exercise in prison on the bare showing that the regulation has a "rational basis." (*Furgan* v. *Ga. State Bd. of Offender Rehabilitation* (N.D.Ga. 1982) 554 F.Supp. 873, 878.) Indeed, as many as seven different standards have emerged in the lower federal courts. (See generally, Comment, *The Religious Rights of the Incarcerated* (1977) 125 U.Pa.L.Rev. 812, 852 [reviewing the seven standards and concluding the "compelling interest" test is the proper one].)

The lead case adopting the "necessity" test is *Teterud* v. *Burns, supra*, 522 F.2d 357. *Teterud* requires courts to be "as vigilant in protecting a prisoner's constitutional rights as we are in protecting the constitutional rights of a person not confined." (*Id.*, at p. 359.) Accordingly, "a regulation which is more restrictive than necessary to meet . . . institutional objectives or which does not serve the objectives advanced will be struck down." (*Ibid.*)

Applying these principles, *Teterud* held that a prison regulation requiring all inmates to maintain short hair violated a Native American inmate's free exercise right to maintain long hair for religious reasons. The court rejected the safety arguments advanced by correction officials, finding that these concerns could be satisfied in a manner less restrictive of the inmate's exercise of religion.

Other cases have similarly applied a "necessity" or "least drastic means" analysis to prisoners' free exercise claims. (See *Gallahan* v. *Hollyfield* (4th Cir. 1982) 670 F.2d 1345; *Wright* v. *Raines* (D.Kan. 1978) 457 F.Supp. 1082; *Moskowitz* v. *Wilkinson* (D.Conn. 1977) 432 F.Supp. 947.) Still others have analyzed prisoners' free exercise claims under the traditional "compelling state interest test" announced in *Sherbert* v. *Verner* (1963) 374 U.S. 398, 403 [10 L.Ed.2d 965, 970, 83 S.Ct. 1790].[17] (See *Kennedy* v. *Meacham* (10th Cir. 1976) 540 F.2d 1057, 1061; *Neal* v. *State of Georgia* (5th Cir. 1972) 469 F.2d 446, 450; *Barnett* v. *Rodgers* (1969) 133 App.D.C. 296 [410 F.2d 995, 1000]; see also *In re Serna, supra,* 76 Cal.App.3d at p. 1022 (dis. opn. of Stephens, J.).)[18] Recently, the Ninth Circuit concluded that the "weight of relevant cases" support a "least restrictive means" approach. (*Capoeman* v. *Reed, supra,* 754 F.2d at p. 1515.)

In light of the confusion as to the meaning of *Cruz* v. *Beto,* it is difficult to determine what standard the Legislature intended to adopt in Welfare and

[17]This standard is discussed *post,* at page 692.

[18]The majority in *Serna* failed to reach the prisoner's free exercise claim, finding instead that he had failed to exhaust his administrative remedies.

Institutions Code section 1705. The fact that the bill which enacted the statute originally contained a "necessity" standard which did not survive subsequent amendments merely adds to the confusion. In short, it is unclear whether the Legislature intentionally rejected a "necessity" test or whether that test was implicitly incorporated in the broader standard of "reasonable opportunity." It is most likely that the Legislature simply intended to leave these questions open by adopting the broad standard of *Cruz*.

However, this court need not enter this briar patch, since another statute resolves petitioners' religious freedom claim. Four years after the passage of Welfare and Institutions Code section 1705, the Legislature enacted section 2600. That statute declares in broad terms that a prisoner's rights are to be limited only to the extent "necessary in order to provide for the reasonable security of the institution in which he is confined and for the reasonable protection of the public." (§ 2600.)[19]

 Although on its face section 2600 applies only to inmates in state prisons, this court has recently held that equal protection principles require its application to be extended to all persons who are "similarly situated with respect to the legitimate purpose of the law . . . ." (*De Lancie* v. *Superior Court, supra,* 31 Cal.3d 865, 872,[20] quoting *Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566, 578 [79 Cal.Rptr. 77, 456 P.2d 645, 38 A.L.R.3d 1194].) This holding requires the extension of section 2600 to persons in YA custody to the extent that their rights are affected by institutional security measures that are unrelated to rehabilitation or treatment.

The YA has never contested the applicability of section 2600 here. Moreover, both lower courts found section 2600 applicable with little or no discussion. Nevertheless, this court must make its own determination.

---

[19]The dissent suggests the enactment of section 2600 was not intended to supercede Welfare and Institutions Code section 1705, and that the latter imposes a lesser standard by which the state may abridge the religious rights of confined persons. (See dis. opn., *post*, at p. 706.) In effect, the dissent argues, religious freedom is entitled to lesser protection from official interference than are other civil rights. This conclusion seems dubious at best. The dissent offers no possible justification for why the Legislature would want to protect religious rights less than other civil rights.

Furthermore, the dissent's conclusion is not supported by the legislative history of the statutes. At the time section 1705 was adopted, it provided a *higher* standard of protection for religious practices than that provided for in section 2600. However, the 1975 amendments to section 2600 expanded the right of prisoners. (Cf. Stats. 1968, ch. 1402, § 1, p. 2763.) As the law currently stands, section 2600 imposes a standard at least as high as section 1705 (if not higher) for protecting the rights of confined persons. In the absence of clearer showing, it is illogical to conclude that the Legislature, having expressed its desire to afford religious practices a greater protection than other civil rights in 1972, suddenly reversed that course in 1975.

[20]*De Lancie* held that "[w]ith respect to the monitoring of conversations, [pretrial] detainees and convicted felons are 'similarly situated,'" and thus protected by section 2600. (*Ibid.*)

This court has recognized that in certain circumstances, the treatment of juveniles and adults may differ. ■■■ For example, *In re Eric J.* (1979) 25 Cal.3d 522, 533 [159 Cal.Rptr. 317, 601 P.2d 549] held that the terms imposed on a juvenile for certain offenses may exceed those imposed upon a felon tried in a criminal court since adults and juveniles are not "similarly situated" with respect to the purposes of their confinement. The court found juvenile commitment proceedings were designed for rehabilitation and treatment, while adult sentencing procedures were for purposes of punishment.

The *Eric J.* court also noted that "[t]he liberty interest of a minor is qualitatively different than that of an adult, being subject both to reasonable regulation by the state to an extent not permissible with adults [citations], and to an even greater extent to the control of the minor's parents unless 'it appears that the parental decisions will jeopardize the health or safety of the child or have a potential for significant social burdens.' [Citation.]" (*Id.*, at p. 530, quoting *In re Roger S.* (1977) 19 Cal.3d 921, 934 [141 Cal.Rptr. 298, 569 P.2d 1286].) From this premise, the *Eric J.* court reasoned that "[w]hen the minor must be removed from the custody of his parents for his own welfare or for the safety and protection of the public [citation], the state assuming the parents' role, the state also assumes the parents' authority to limit the minor's freedom of action." (*Eric J., supra,* 25 Cal.3d at p. 530.)

*Eric J.'s parens patriae* logic has its limits. *Eric J.* involved the state's role in carrying out rehabilitation and treatment of youths—a "parental" function. ■■■ The YA does not contend that the installation of microphones in the chapel is part of its program of rehabilitation and treatment.

Moreover, there is no evidence that rehabilitation or treatment objectives have altered the YA's design of security systems in detention facilities.[21] Nor has the YA contended that wards need to be subjected to stricter security measures than state prisoners because they are wards of the state. Here, the YA's action is motivated purely by security concerns. In fact, it concedes that the provisions of section 2600 should be applied to juvenile wards.

---

[21]Nothing in this analysis is inconsistent with this court's recent opinion in *In re William G.* (1985) 40 Cal.3d 550 [221 Cal.Rptr. 118, 709 P.2d 1287] or the United States Supreme Court's recent decision in *New Jersey* v. *T.L.O.* (1985) 469 U.S. 325 [83 L.Ed.2d 720, 105 S.Ct. 733]. Those opinions justify the adoption of a "reasonable suspicion" standard for searches in a school setting by emphasizing the strong "governmental interest in promoting a safe learning environment" in the school setting. (*William G., supra,* 40 Cal.3d at p. 564; *New Jersey* v. *T.L.O., supra,* 469 U.S. at p. 341 [83 L.Ed.2d at pp. 733-734, 105 S.Ct. at p. 743].) There is no counterpart when police are dealing with the general public. The relevant comparison here is not between a school setting and nonschool settings, but rather between persons in YA custody and those in state prison.

Thus, YA wards are similarly situated to state prisoners to the extent that their rights are restricted by security measures unrelated to any rehabilitation or treatment objectives.[22] Consequently, wards are entitled to the protection of the provisions of section 2600. The YA has advanced no compelling state interest that justifies treatment under a different standard.

 Having found the provisions of section 2600 applicable, the next task is to determine whether the security interests of the institution outweigh the privacy and religious rights of the wards.[23] *De Lancie* v. *Superior Court, supra,* 31 Cal.3d 865, provides the guiding principle: "The Legislature, in enacting these sections, evidently intended to place the rights of inmates as nearly as possible on the same footing as noninmates, subject to the needs of institutional security or protection of the public." (*Id.,* at pp. 875-876.)

Section 2600 provides in relevant part that prisoners "may . . . be deprived of such *rights,* and only such rights, as is *necessary* in order to provide for the *reasonable security* of the institution . . . ." (Italics added.) Reviewing a claim under section 2600 requires a three-step inquiry: (1) Are any "rights" implicated? (2) If they are, does a "reasonable security" problem exist which might permit a deprivation of rights under the statute? (3) If so, to

---

[22]It is significant that the Legislature has manifested its determination that *no* distinction exists between juveniles in custody of the YA and others in custody with regard to their religious freedom. Identical statutes protect the religious freedom of prisoners, persons in custody in local detention facilities, and persons in YA custody. (§§ 4027, 5009; Welf. & Inst. Code, § 1705.) In matters of religious freedom, the Legislature has manifested a policy of uniform treatment regardless of the status of the individual.

Similarly, section 636 makes no such distinction. *All* persons in custody, regardless of their status, are protected from eavesdropping or recording of their conversations with religious advisors, attorneys, or physicians. Here again the Legislature has adopted a policy of equal treatment with regard to the privacy and religious freedom concerns of all confined persons.

[23]Both parties and amicus curiae have extensively briefed this issue. The core of their dispute stems from disagreement as to how section 2600 should be applied. Specifically, they differ over (1) which party shall bear the burden of proof in such matters and (2) what the burden is. Due to the closeness of this issue, this case may well turn on the resolution of these differences.

Petitioners argue that the YA must prove that the sound security system is "necessary" for the security of the institution and show that it is the least drastic means of achieving that goal. Respondent takes the opposite view and claims that petitioners bear the burden of proving that the proposed security system is *not* necessary and that the restrictions on religion and privacy are "unreasonable." The Court of Appeal accepted respondent's argument and took it a step further, holding that petitioners would fail to carry their burden unless they could show that the institution's expressed security concerns were not "sincerely held" or were "exaggerated."

what extent are deprivations of those rights "necessary" to satisfy reasonable security interests.[24]

 What, then, are the "rights" at issue here? Respondent argues, as does the dissent, that the rights guaranteed by section 2600 are circumscribed by cases which define prisoners' rights under the federal Constitution. This is not a proper approach for analyzing claims under that statute.

*De Lancie* rejected this approach (*id.*, at pp. 875-876), and with good reason. The federal prisoner's rights cases utilize a different balancing formula than that required under section 2600. The federal equation does not require prison security measures to be as closely tailored to security objectives as does section 2600. As the dissent explains, a few federal cases on this issue have upheld infringements of inmates' liberty on the mere

---

[24]This court has not always applied section 2600 in three distinct steps. This has led to some confusion as to the proper analysis of claims under the statute.

For example, *In re Price* (1979) 25 Cal.3d 448, 452-453 [158 Cal.Rptr. 873, 600 P.2d 1330], perhaps because of its brevity, has been misinterpreted as holding that section 2600 imposes a "reasonableness" standard. (See, e.g., *In re Cummings* (1982) 30 Cal.3d 870, 873 [180 Cal.Rptr. 826, 640 P.2d 1101, 29 A.L.R.4th 1207] (plur. opn.).) However, neither *Price* nor the wording of section 2600 supports such a standard.

The confusion over *Price* stems from the statement that "[i]n th[e] context [of section 2600], we must determine whether the . . . regulation is reasonable . . . ." (*Price, supra,* 25 Cal.3d at p. 453.) However, the statement in full relates to a discussion of "whether the prison administration is unreasonable in its *concern* that prisoners' union meetings and activities are a potential *threat* to the security of penal institutions." (*Ibid.,* italics added.) Placed in perspective, the *Price* court's "reasonableness" standard is simply the second step of the analysis to be applied here—i.e., whether the *security concerns* are "reasonable." Finding the administration's security concerns reasonable, the *Price* court found the necessity for the measures to be self-evident. (See *In re French* (1980) 106 Cal.App.3d 74, 82 [164 Cal.Rptr. 800] [inferring a finding in *Price* that the "necessity" of the restriction of rights was self-evident].)

*Price* does not stand for the proposition that reasonable security objectives, without more, are sufficient to justify a limitation on prisoners' rights. The statute requires a further finding that the means employed to achieve those objectives are the least intrusive on prisoners' rights.

Aside from *Price,* several opinions by this court have carefully distinguished the various elements of section 2600. For example, in *In re Reynolds* (1979) 25 Cal.3d 131 [157 Cal.Rptr. 892, 599 P.2d 86], the issue was whether the Director of Corrections could invoke section 2600 to enforce a ban on the wearing of prisoners' union lapel buttons. The threshold inquiry was whether the wearing of buttons generally was a protected right under the First Amendment. In answering that question in the affirmative, this court relied upon cases involving the wearing of buttons by nonincarcerated students in a public school setting. Only after resolving that issue did the court broach the question of whether the security concerns of prison officials were reasonable. Finding they were not, the court ended its inquiry. (*Id.,* at p. 135; see also *In re Brandt* (1979) 25 Cal.3d 136 [157 Cal.Rptr. 894, 599 P.2d 89] [companion case to *Reynolds*].)

Although the lead opinion in *In re Cummings, supra,* 30 Cal.3d 870 did not adhere to this approach, four justices did—two concurring separately in the plurality's result and two dissenting. Thus, *Cummings* is consistent with the analysis section 2600 requires.

Finally, respondents rely on *In re Gallego* (1982) 133 Cal.App.3d 75, 84 [183 Cal.Rptr. 715]. That case is inapposite, since it did not involve section 2600.

showing that the measures are a "rational response" to a security problem. (Dis. opn., *post,* at pp. 708, 709; *Bell* v. *Wolfish* (1979) 441 U.S. 520, 550 [60 L.Ed.2d 447, 476, 99 S.Ct. 1861].) The "rational response" standard thus permits infringements of liberty whenever they are rationally related to security concerns, and does not require prison officials to search for the least drastic means of addressing those concerns.

In contrast, section 2600 permits only such security measures as are "necessary." By definition, the "necessary" standard requires that a security measure be the least intrusive possible of inmates' rights yet flexible enough to satisfy the security need. (See discussion, *post,* at pp. 697-698.) Since the federal cases balance the competing concerns under a different standard, it is obvious that to incorporate those cases into section 2600 would effectively read that statute out of existence.

Finally, since the federal cases already accommodate government security concerns in *defining* the scope of prisoners' rights,[25] it would be inappropriate to use those cases to analyze the first prong of a section 2600 claim. (See *ante,* at p. 689.)

For the foregoing reasons, while federal cases may be illustrative of the problems inherent in balancing the state's security interests against the rights of detainees (cf. *Bailey* v. *Loggins* (1982) 32 Cal.3d 907, 922 [187 Cal.Rptr. 575, 654 P.2d 758] (plur. opn.)), they do not define the scope of rights guaranteed by section 2600.

In order to remain true to the legislative intent of section 2600, the balancing analysis must begin with a discussion of the rights of non-confined citizens.[26] (See *In re Reynolds, supra,* 25 Cal.3d at p. 134; *In re Brandt, supra,* 25 Cal.3d at pp. 138-139, 140 [refusing to follow a factually identical federal prisoners' rights case]; see also *Bailey* v. *Loggins, supra,*

---

[25]The United States Supreme Court recently explained that in analyzing prisoners constitutional claims, it has "insisted that prisoners be accorded those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration." (*Hudson* v. *Palmer* (1984) 468 U.S. 517, 523 [82 L.Ed.2d 393, 401, 104 S.Ct. 3194, 3198].) Furthermore, that court has held that "imprisonment carries with it the circumscription or loss of many significant [constitutional] rights. [Citations.] These constraints . . . are 'justified by the considerations underlying our penal system,'" and inmates' rights are limited, "as a practical matter, to accommodate a myriad of 'institutional needs and objectives' of prison facilities, [citation], chief among which is internal security, [citations]." (*Id.,* at p. 524 [82 L.Ed.2d at p. 401, 104 S.Ct. at p. 3199].)

[26]For this reason, *In re Price, supra,* 25 Cal.3d 448, 452-453, in which the court declared that prisoners have no constitutional right to association *before* the court applied section 2600, may not be an accurate analytical model.

32 Cal.3d at pp. 915 (plur. opn.),[27] 923 (conc. opns. of Newman, J., and Bird, C. J.); *Keyhea* v. *Rushen* (1986) 178 Cal.App.3d 526, 533-534 [223 Cal.Rptr. 746].)

Petitioners contend that their rights to religious freedom have been infringed. In the area of religious freedom the basic principles of the state and federal Constitutions are fairly well settled. Both Constitutions guarantee the freedom to hold and exercise religious beliefs. (*Cantwell* v. *Connecticut* (1940) 310 U.S. 296, 303-304 [84 L.Ed. 1213, 1218, 60 S.Ct. 900, 128 A.L.R. 1352]; *People* v. *Woody* (1964) 61 Cal.2d 716, 718 [40 Cal.Rptr. 69, 394 P.2d 813].) ▇▇▇ The First Amendment permits "abridge[ment of] religious practices only upon a demonstration that some compelling state interest outweighs the defendants' interests in religious freedom." (*People* v. *Woody, supra,* 61 Cal.2d at p. 718; see *Sherbert* v. *Verner, supra,* 374 U.S. 398, 406 [10 L.Ed.2d 965, 971-972]; *Weaver* v. *Jordan* (1966) 64 Cal.2d 235, 241 [49 Cal.Rptr. 537, 411 P.2d 289].)[28]

▇▇▇ Under the federal Constitution, application of these principles requires a determination as to whether any state action imposes a "burden" on the free exercise of religion, and if so, whether a compelling state interest outweighs that infringement. Since section 2600 provides its own balancing test, only the first step of the First Amendment analysis—i.e., whether the YA's proposed sound security system imposes a "burden" on the religious freedom rights of wards—need be examined.

Both parties presented evidence regarding the impact that the presence and operation of listening devices in the Protestant chapel complex at Karl Holton School will have on religious practices. Four chaplains testified it would have a chilling effect.

Rabbi Samuel Graduenz, a member of the State Advisory Committee on Institutional Religion, testified that the value of his work as a Jewish chaplain at Deuel Vocational Institution would be "completely diminished" if listening devices were installed. He emphasized the unique role a religious advisor plays in the institutional setting. "[T]he people under my care feel completely secure and free to talk with me [about] whatever is on their

[27]The application of federal prisoners' rights cases in *Bailey* was limited to generic First Amendment issues involving state publications generally. (See *id.,* at pp. 917-920, 923 (conc. opn. of Bird, C. J.).)

[28]This court rests its decision on both state and federal law. Unless otherwise indicated, references to the First Amendment are also intended to refer to article I, section 4 of the California Constitution. That section provides in relevant part: "Free exercise and enjoyment of religion without discrimination or preference are guaranteed. This liberty of conscience does not excuse acts that are licentious or inconsistent with the peace or safety of the State."

mind, and that is what I'm there for. . . . They feel the chaplain, the Rabbi, the minister, the priest is the one person they can come to under all and any circumstances to pour out their hearts. . . . [I]f they were to be made aware of [listening devices in the chapel], they would lose all contact with me as they have lost contact with the general administrative people."

Harry Warwick served as chaplain at San Quentin Prison and Soledad Correctional Training Facility for more than 30 years. At the time of the hearing, he was a member of the State Advisory Committee on Institutional Religion. He felt that electronic surveillance "would be an infringement upon the privacy and the relationship between the chaplain and his parishoner . . . [T]here is a relationship between the pastor and his parishoner that is totally private. And I would want to feel that as chaplain an inmate could come to me at any time under any circumstances and discuss without any infringement whatsoever on the relationship, and . . . [a]s for me personally, I would find that a gigantic infringement upon my spiritual ministry. I don't want any eavesdropping on what I have to say to a parishoner, none."

John Day, Protestant chaplain at the YA's DeWitt Training Center in Stockton, testified that wards have inquired as to whether his office or the chapel had been "bugged." They stated that they would be "a lot more cautious in what they said" if the "bugs" were there.

Finally, Reverend Kenneth Leep, Protestant chaplain at Karl Holton School, testified that electronic surveillance within the chapel would have a "dampening effect" on the expression of religion—that the wards would not be "as open and free to speak with the devices there [as] they would be without them there."

Leep also testified that conversations with the wards are not always quiet and intellectual. Frequently, he explained, "when you tell somebody their mother passed away, they get very emotional. And I've had guys cry. I've had guys scream. I've had guys beat on the pews, throw hymnals, various other things and just kind of venting themselves and letting their emotions out."

Leep also testified that he often does his spiritual counselling in the chapel rather than his office, because the wards "feel more comfortable [talking] in the chapel." His office is very small, he explained, and he "can't close the door with another person in there very easily." Sometimes, he finds the chapel a better place for counselling, particularly when he has to tell wards about a death in the family or other "traumatic" news where the wards "want to find a place to pray." Sometimes he prays with them. Other times

he lets them pray alone in the chapel where he can observe them through a window in his office.

Finally, Leep testified that the planned activation of the chapel microphone has already had detrimental effects. "The little boxes are already in the foyer and I've had a number of wards ask me if they're on even when I assure them they're not. . . . If I'm assured they're off I don't have any problem myself. But I think I would have quite a bit of a problem assuring others that they were off. . . . In fact, I've been taken to the back room and show[n] that the wires are not connected. ██ And yet those who I speak with aren't assured of that and so they're less likely to talk. So it does have an effect on me in that way."[29]

The only ward who testified at the hearing was petitioner Escobedo. He stated that the chapel was "the only place right now that [he] can go and not feel 'bugged' or . . . under surveillance. I'm under sight supervision by the chaplain . . . and I can communicate freely with him without fear of . . . reprisals being held against me by other staff members if they found out some of the things I was discussing with him. . . . [I]t wouldn't feel as relaxed and free as it is right now."

The YA conceded before the trial court that the system has had and will have a chilling effect on the wards' exercise of religion. However, it withdrew this concession before the Court of Appeal. The YA now contends that petitioners' rights to free exercise of religion have *not* been violated.

The YA makes three arguments in support of its position. First, it points out that many of the religious functions in the Karl Holton School chapel are open to the public. Next, the YA contends that the chaplain's office is available for private counselling. The conversation will remain unmonitored with the door closed. Finally, it argues that the chaplain's ability to have the microphone turned off ensures that religious practices will not be chilled.

As respondent notes, many of the religious services conducted in the Protestant chapel at Karl Holton School are open to the public. However, that does not mean that the microphone has no chilling effect. As several chaplains testified, there is a difference between an individual who comes to share in worship and one who comes to monitor what is being said. When

---

[29]The YA produced evidence that the Associated Chaplains in California State Service and some members of the State Advisory Committee on Institutional Religion believe that electronic sound surveillance is not objectionable on religious freedom grounds. (See dis. opn., *post,* at p. 707.) The weight to be given these opinions is minimal, however, since unlike the testimony of the several chaplains, the opinions were not supported by any factual testimony.

the "monitor" is state-sponsored, be it human or electronic, constitutional rights to religious expression are implicated if the monitor's presence has a chilling effect. (Cf. *White* v. *Davis* (1975) 13 Cal.3d 757 [120 Cal.Rptr. 94, 533 P.2d 222] [allegations of routine police surveillance of public classrooms state a prima facie case of First Amendment violations due to potential chilling effect on freedom of speech].) Few would dispute the chilling effect of governmental monitoring of churches or synagogues. Similarly, the presence of a listening device in the foyer of the school chapel has such a chilling effect, even on "public" religious exercises.[30]

Respondent's next argument also fails. There is no proof that the chaplain's office will be free of monitoring. The microphone is only 10 feet away from the office door. (See fn. 5, *ante.*) Reverend Leep's experiment produced inconclusive results. The YA did not demonstrate that Leep was an expert in conducting such tests or otherwise experienced in accurately gathering or reporting such data. The failure to consider such variables as the level of background noises raises serious questions as to the reliability of such tests.

Finally, our dissenting colleague incorrectly asserts that the superior court's factual finding that office conversations cannot be monitored is entitled to "great weight." (Dis. opn., *post*, at p. 707.) Since our difference of opinion with the lower court stems from technical infirmities in the methods of testing and is not based on the credibility of live testimony, such deference is inappropriate. (See *In re Wright* (1978) 78 Cal.App.3d 788, 801-802 [144 Cal.Rptr. 535] ["great weight" given to factual determinations made by factfinder "with respect to questions of or depending on the credibility of witnesses the [factfinder] heard and observed"].)

Even assuming the tests were reliable, the relatively small size of the chaplain's office permits counselling on a one-to-one basis only. Obviously, for group counselling, monitored areas will have to be utilized. To relegate a ward and his religious advisor to the use of the chaplain's office certainly "burdens" religious exercise.[31]

---

[30]It also appears that the sound monitoring system would serve no useful purpose during public worship services in any event. Due to the high noise level created by such services, the system's ability to distinguish between "background" noise and cries for help is greatly diminished. Furthermore, the record indicates that multiple staff members are present during such services. Presumably, any one of them could intervene if a disturbance occurred during the service.

[31]The dissent argues that the YA is not bound to exempt any particular area of the institution from sound surveillance. (Dis. opn., *post*, at p. 707.) The proper inquiry, however, does not focus on which *locations* are or are not subject to sound surveillance, but whether YA surveillance imposes an unnecessary burden on the wards' *practice* of religion.

Respondent's final argument requires a more detailed discussion. The chaplain's authority to order the microphone disconnected is not absolute, as evidenced by this proceeding. Moreover, at oral argument, counsel for the YA conceded that the chaplain's power to order the microphone turned off is subject to the veto of those in the control room. Under these circumstances, it cannot be said that the chaplain's power to request the microphone disconnected in any way eliminates the chilling effect of the system.

Even assuming the chaplain's authority were absolute, that would only eliminate the burden on *his* religious exercise. However, the issue here is the rights of the *wards*. Petitioner presented evidence that the mere presence of the microphone has a chilling effect on a ward's willingness to communicate freely during spiritual counselling sessions with the chaplain. The chilling effect occurs whether the microphone is on or off. The wards cannot rely on a chaplain's assurances that it is off. Indeed, Paul Scharf, an expert on such matters, testified that it would be very easy to "wire around" the standard wiring so that even the chaplain would not know whether the system was truly disconnected.

Based on this evidence, it appears that the installation of microphones in the Protestant chapel complex has had and will have a chilling effect on the wards' exercise of religion.[32]

Having concluded that the YA's actions have a chilling effect on petitioners' freedom of religious exercise, the next task is to determine whether the YA's security concerns are "reasonable." If they are, the balancing formula set forth in section 2600 is triggered.

"Reasonableness," of course, is an objective standard, requiring more than good faith. However, in assessing the existence of a security risk in correctional institutions, courts should give some deference to prison officials' experience and expertise, unless it is shown that these security concerns are exaggerated or not sincerely held.

Petitioners do not question the YA's sincerity. However, they do point out that there has never been a violent attack on a chaplain, ward, or other individual in any chapel within the YA system. Nonetheless, the YA insists that a potential for such an attack exists. This conclusion is reasonable.

According to YA personnel, several "very serious incidents have occurred in or near the chapel" at O. H. Close School, a nearby YA facility. These

---

[32]Petitioners also claim an infringement of their right to privacy. However, since that claim is no broader than their religious freedom claim, this court need not reach that claim. Suffice it to say that the presence of microphones appears to clearly invade the privacy surrounding clergy-penitent communications.

included "gang confrontations, escapes, sexual attacks on younger weaker wards, and various contraband problems, ranging from hidden narcotics to 'ripping off' the chaplain's sacramental wine."[33] Finally, a YA security task force concluded in 1974 that there are inherent security risks whenever a large group of wards assemble with only few staff members present. In light of this evidence, the concern for security in YA chapels is objectively reasonable.

The final inquiry—and the crux of this dispute—is whether there exist less drastic alternatives that would not chill the exercise of religion in the chapel complex.

 ██ Section 2600 permits deprivation of civil rights when "necessary" for "reasonable security." This "necessity" test requires a showing that lesser drastic means are not available for addressing the reasonable security concerns they have raised. (*In re Parker* (1984) 151 Cal.App.3d 583, 590 [198 Cal.Rptr. 796]; *In re Stone* (1982) 130 Cal.App.3d 922, 929 [182 Cal.Rptr. 79]; *In re Bell* (1980) 110 Cal.App.3d 818, 822 [168 Cal.Rptr. 100]; *In re French, supra,* 106 Cal.App.3d 74, 83; see also *Keyhea* v. *Rushen, supra,* 178 Cal.App.3d at p. 542; *De Lancie* v. *Superior Court, supra,* 31 Cal.3d at p. 874, fn. 9 [approvingly citing *French*].)[34]

However, this test does not require "prison administrators to establish procedures which would jeopardize institutional security solely because they provide a lesser restriction on [an individual's] rights. ██ ██ ██ Courts have only required that if the goal of reasonable institutional

---

[33]Obviously, due to the apparent limitations of the monitoring system, the problem of smuggling drugs or stealing sacramental wine would in no way be deterred by the system, unless the perpetrators were boisterous in their misconduct.

[34]As discussed in footnote 22, *ante,* the parties disagree as to which party has the burden to prove the elements of a section 2600 violation. Petitioners have shown that their rights are implicated by the YA's action, and respondent has shown an objective basis for its security concerns. Good faith as to those concerns has been presumed.

The burden of proving the absence of lesser drastic means is on respondent. This is consistent with established principles of constitutional law, since fundamental rights of individuals cannot be abridged unless the state shows the abridgement is "necessary" to further a compelling governmental interest.

This analysis has been used in cases dealing with prisoners as well as nonprisoners. For example, in *Payne* v. *Superior Court* (1976) 17 Cal.3d 908 [132 Cal.Rptr. 405, 553 P.2d 565], the court noted that where a fundamental right of a prisoner is at issue, "the government must show that its interest cannot be satisfied by alternative methods less restrictive of the individual right abridged." (*Id.,* at p. 914.) Similarly, the court in *In re Harrell, supra,* 2 Cal.3d at page 686 held that "the burden of justification" is upon prison officials once a prisoner's fundamental rights are significantly infringed.

Under section 2600, *respondent* must show that it has chosen the least drastic means to further an objectively reasonable security need.

security can be effectively[35] promoted by several different means, the least restrictive one be chosen. [Citations.]" (*In re Stone, supra,* 130 Cal.App.3d at p. 929.)[36]

■ The YA asserts that the sound monitoring system is the least restrictive means of effectively maintaining security within the chapel. It argues that the current security system, which consists only of the personal FM beeper which the chaplain wears, has certain security limitations. Electronic sound surveillance in the chapel would overcome these limitations. This is sufficient proof, the YA contends, to show that among the available alternatives, electronic sound surveillance in the chapel is the means least intrusive of religious exercise.

This argument is not persuasive. Even assuming that the YA's security concerns with the FM beeper system are legitimate,[37] there are several reasons why the proposed sound monitoring system is not the only alternative for maintaining chapel security.

First, the record discloses no effort by the YA to design a security system that could accommodate the special privacy needs of wards' religious practices. The decision to install microphones throughout the Karl Holton School facility was made in 1974 in a security task force report for the entire YA system. The report recommended the personal FM beeper system and sound

---

[35]The Court of Appeal in *In re Bell, supra,* 110 Cal.App.3d at page 822, observed that "less restrictive means" are required to be "equally effective" as well. This language, as even *Bell* indicates, cannot be applied literally.

Admittedly, there may be security measures which are absolutely effective but deprive prisoners of virtually all rights. Thus, a de minimis increase in institutional security cannot be used to justify a substantial infringement of civil rights. *Stone* appears to strike the proper balance.

[36]Contrary to the alarming consequences forecast by our dissenting colleague, the imposition of this standard will in no way "place the lives of YA wards and personnel at risk." (Dis. opn., *post,* at p. 706.) This standard enunciated in section 2600 does not compel an "either/or" choice between chapel security and individual rights. It merely requires that diligent efforts be made to accommodate *both* interests to the greatest extent feasible. Properly applied, the standard does not place anyone's life "at risk."

[37]The chaplain could conceivably be disarmed of his beeper, depriving him of the ability to call for assistance. Of course, there is no evidence of this ever having occurred in the chapel or anywhere else in the YA for that matter. (Although the dissent alludes to two attacks on staff members in 1975 and 1976 (dis. opn., *post,* at p. 707), these occurred before staff were equipped with personal FM beeper alarms. Today, all staff members, including the chaplain, are so equipped.)

Another security problem is that the beepers transmit a signal and offer no communication of the nature of the problem at hand. This information is important, officials say, because security personnel need to know the nature of a problem in order to know how to render assistance.

Finally, the YA points out that the personal beeper system would not alert staff to altercations between wards when no staff members are present.

surveillance. The YA decided to install the electronic sound surveillance system in all areas of the school complex. Thus, the same system utilized for gymnasiums, dining halls, and dormitories was used without modification for the Catholic and Protestant chapels as well. In short, the special privacy requirements of religious activities in the chapel were apparently given no consideration in designing the security system.[38]

Furthermore, the record shows no effort by the YA to explore security options other than beepers and sound monitoring—measures which might be less intrusive upon religious practices within the chapel. Several such options have been suggested in the course of this litigation. For example, petitioners introduced evidence of new-technology FM beepers which have sound-transmitting capability and can be triggered by a sudden change in direction. Such beepers would be activated in the event that a ward assaults the chaplain or staff member. In many circumstances, they would also allow the staff person to inform control-room personnel of the nature of the problem at hand in many circumstances.

Of course, such technological improvements are only a partial solution to the security concerns raised by the YA. They would not solve the problems of altercations between wards in the absence of staff members, or altercations between the chaplain and ward(s) during private counselling. However, these concerns might well be met by some combination of additional security measures more particularly tailored to the problem. For example, current policy prohibits wards from entering the chapel when staff members are not present. The chapel is to remain locked at all times unless the chaplain is there. Therefore, altercations between unattended wards would be a problem only when wards made unauthorized entries into the chapel. Surely, an alarm system could be explored as a less intrusive alternative. Yet there is no evidence that the YA has explored this option, even though business and other establishments have undoubtedly found it adequate for their security needs.

As for the threat of an altercation between the chaplain and ward(s) during private counselling, petitioners have conceded that the use of guards or escorts for YA wards during counselling would be an acceptable less intrusive alternative. Although the court need not address the constitutionality of such measures in this case, the YA might do well to explore their effectiveness as alternatives to electronic surveillance. Until the YA explores such alter-

---

[38]As a result of this petition, the YA did permit the chaplain to request that the chapel microphone be turned off. However, the ultimate decision to honor that request remains with YA officials. Furthermore, when the system is turned off, the chaplain is not protected by it. This all-or-nothing approach is apparently yet another consequence of the YA's failure to seriously consider more effective security measures.

natives, its barebones assertion that the sound-surveillance system is the least restrictive means is not entitled to great deference.

Of course, it is not this court's job to design security systems, and the above suggestions are not exhaustive. Ultimately, the YA must determine the effectiveness of less restrictive alternatives. However, it is this court's job to ensure that the YA has made a diligent effort to make such determinations. Nothing in the record indicates that it has. In the absence of a more substantial showing that the YA has explored the effectiveness of less intrusive alternatives and found them to be ineffective, this court cannot hold that the sound monitoring system is truly "necessary" for institutional security.

Consequently, the presence of the microphone and the use of the sound security system in the chapel violate section 2600.

### IV.

"[T]he right to free religious expression embodies a precious heritage of our history." (*People* v. *Woody, supra,* 61 Cal.2d at p. 727.) The importance of religion in the treatment and rehabilitation of wards of the YA cannot be ignored. As the court in *Barnett* v. *Rodgers, supra,* 410 F.2d 995 observed in a similar context, ". . . [t]hat penal as well as judicial authority respond to [their] constitutional duties . . . . is vastly important to society as well as the prisoner. Treatment that degrades the inmate, invades his privacy, and frustrates the ability to choose pursuits through which he can manifest himself and gain self-respect erodes the very foundations upon which he can prepare for a socially useful life. Religion in prison subserves the rehabilitative function by providing an area within which the inmate may reclaim his dignity and reassert his individuality." (*Id.,* at p. 1002.) The same is no less true for wards in YA custody, where the practice of religion can make an important contribution to the ultimate goals of rehabilitation and treatment.

The use of the chapel microphone and monitoring system at the YA's Karl Holton School violates section 636 to the extent it is used to eavesdrop on conversations between wards and their religious advisors. Furthermore, the use of the monitoring system violates section 2600, which applies to YA wards, since it restricts the free exercise of religion to an extent greater than necessary to satisfy the reasonable security concerns of school officials.

Accordingly, the YA is ordered to permit wards to attend chapel at the Karl Holton School free from the presence of electronic listening devices. However, since petitioner Arias shows no present right to release from

constructive custody and petitioner Bolton is no longer subject to the YA's jurisdiction, the order to show cause is discharged and the petition for writ of habeas corpus is denied. (*In re Harrell, supra,* 2 Cal.3d at p. 706; *In re Estrada* (1965) 63 Cal.2d 740, 750-751 [48 Cal.Rptr. 172, 408 P.2d 948].)

Broussard, J., Reynoso, J., and Lytle (Alice A.), J.,* concurred.

**GRODIN, J.,** Concurring and Dissenting.—As the majority observes, the Legislature has enacted a variety of statutes to protect the religious freedom of both juvenile wards and adult prisoners in this state, and the proposed installation of an electronic listening device in a Youth Authority chapel raises troublesome questions under a number of these provisions. As I shall explain, however, I find myself in disagreement with the majority's analysis on a number of points.

I

To begin with, I agree with the majority that Penal Code section 636 does not prohibit only "secret" monitoring of confidential priest-prisoner conversations, but rather guarantees the fundamental right of prisoners to consult confidentially with an attorney, religious advisor or physician. Just as the Youth Authority could not properly preclude a prisoner and his attorney from communicating confidentially even if it posted a large sign outside the attorney conference room notifying the prisoner and attorney that their conversation was being monitored (cf. *De Lancie* v. *Superior Court* (1982) 31 Cal.3d 865, 876 [183 Cal.Rptr. 866, 647 P.2d 142]), so it may not, consistent with section 636, effectively preclude confidential conversations between a juvenile ward and his religious advisor through overt monitoring. Although the Youth Authority may take other measures to ensure the security of the correctional facility, section 636, in my view, precludes it from adopting a surveillance procedure that invades the sanctity of the confessional. Thus, if the proposed monitoring system in fact prevented a ward from conversing confidentially with his religious advisor, I agree that the system would violate section 636, even if the ward and priest were fully aware that their conversation was being overheard.

To my mind, the relevant question under section 636 is whether the proposed system at issue here will in fact foreclose or improperly intrude on confidential priest-prisoner conversations. Although it appears from the evidence presented at the hearing that the proposed placement of the microphone would permit security officials to monitor conversations in the sanctuary or foyer, the only evidence presented with respect to conversations

*Judge, Sacramento Municipal Court, assigned by the Chairperson of the Judicial Council.

within the priest's office suggests that, when the office door is closed, the contents of private conversations within the office cannot be overheard. On this record, I do not believe we could properly find otherwise. Of course, if in the future it is shown that the listening device does, in fact, intrude on confidential conversations, I believe that the device would have to be removed.

The majority concludes, however, that even if the priest's office is available for confidential, unmonitored conversations, the surveillance system nonetheless violates section 636 because authorities can overhear conversations between a ward or his religious advisor in the public areas of the - chapel. Although the opinion acknowledges that section 636 would not be violated if a conversation between a priest and a ward were overheard by a microphone in other areas of the juvenile facilities (*ante,* p. 681), it concludes that section 636 prohibits the prison authorities from installing a listening device "in locations traditionally used" for priest-prisoner conversations. (*Ante,* p. 681.)

The majority cites no authority to support this construction of section 636, and I find it difficult to accept this view of the statute. In the analogous context of attorney-prisoner conversations, I think that it has generally been understood that prison authorities ordinarily retain the authority to decide *where* confidential conversations may take place; so long as the authorities provide adequate facilities for such confidential conversations, I do not think we would find that section 636 was violated simply because an attorney or prisoner believes that some other locale within the facility would be preferable. For similar reasons, I conclude that section 636 does not prescribe a specific locale for priest-prisoner conversations and so long as the prison or juvenile authorities provide an adequate opportunity and facilities for confidential, unmonitored conversations between a ward and his religious advisor, the surveillance of other areas of the facility does not violate the statute.[1]

Accordingly, on the present record, I would not find that the proposed monitoring system violates section 636.

## II

Even if the challenged security system does not impermissibly infringe on a ward's opportunity to engage in confidential discussions with his

---

[1] I am aware of no case which addresses the question whether section 636 was intended to protect the confidentiality of group counseling sessions by a religious advisor, as contrasted with one-on-one confessions or conversations. In the somewhat analogous context of the priest-penitent privilege, the relevant statute defines the privileged "penitential communication" to mean "a communication made in confidence, in the presence of no third person so far as the penitent is aware." (Evid. Code, § 1032; cf. *Simrin* v. *Simrin* (1965) 233 Cal.App.2d 90 [43 Cal.Rptr. 376].)

religious advisor, the proposed surveillance of "public" religious services or of priest-led group discussions raises questions under a number of additional statutory provisions which (1) assure that wards must be "afforded reasonable opportunities to exercise religious freedom" (Welf. & Inst. Code, § 1705) and (2) permit correctional authorities to limit a prisoner's rights only to the extent "necessary in order to provide for the reasonable security of the institution in which he is confined and for the reasonable protection of the public." (Pen. Code, § 2600.) As I explain, although I agree with the majority's reversal of the trial court judgment, the basis of my conclusion differs from that of the majority.

To begin with, there seems little question but that the routine surveillance or bugging of religious services does implicate First Amendment concerns. Outside the prison context, I trust that no one would doubt that a governmental policy of routinely bugging churches or synagogues, or of regularly monitoring the content of sermons or religious group counseling, would be unconstitutional, at least in the absence of the most compelling governmental justification. In *White* v. *Davis* (1975) 13 Cal.3d 757 [120 Cal.Rptr. 94, 533 P.2d 222], we held that allegations of routine police surveillance of university classrooms stated a prima facie case of a violation of First Amendment freedoms in light of the potential chilling effect such surveillance would have on freedom of speech. (See also *Local 309* v. *Gates* (N.D.Ind. 1948) 75 F.Supp. 620 [surveillance of union meeting]; *Bee See Books Inc.* v. *Leary* (S.D.N.Y. 1968) 291 F.Supp. 622 [surveillance of book store].) It is difficult to see why a similar surveillance operation conducted in a municipality's churches would not have a comparable chilling effect on freedom of religion. Thus, I agree with the majority that because the proposed surveillance system will have at least some adverse effect on the right of religious freedom, the state bears the burden of demonstrating adequate justification for the adoption of such a measure.

As the majority also recognizes, however, the state obviously has a much greater justification in imposing security measures in a chapel located in a prison or in a Youth Authority facility than it does in a neighborhood church. There are inherent security risks in a correctional institution whenever a group of wards or prisoners assemble, and correctional authorities bear the responsibility of protecting priests, chaplains, or rabbis, as well as other staff members and vulnerable wards, from potential danger. Unfortunately, prison chapels, no less than exercise yards or other common areas, may become the site of violent incidents.

The question thus narrows to whether the proposed security measure impinges on religious freedom "only to the extent necessary in order to provide for the reasonable security of the institution." The correctional

authorities in this case do not maintain that in order to provide for the reasonable security of the facility it is necessary routinely to monitor ordinary conversations that occur in the chapel area. As the majority explains, the security system at issue here is designed to operate initially simply as an alarm system, and to serve that purpose the microphone in the chapel vestibule is normally to be set at a threshold level "just above the level of 'background' noise so that only 'loud' rather than 'routine' noises will trigger the control room speaker." (*Ante,* p. 675.) If the system could operate only in this fashion, and if ordinary conversations could be overheard only after some emergency alarm had been triggered, I think that the adverse effect on religious freedom would be so minimal that the validity of the system could easily be sustained.

Problems arise, however, from the fact that the microphone, once in place, is capable of intruding on religious services and counseling to a degree beyond that which the authorities claim is needed for security purposes. Under the proposed system, routine monitoring of ordinary conversations is possible, and the apprehension that such monitoring may be occurring may cast a pall over religious activities in the chapel that is not justified by security concerns. The difficult question posed here is what remedy, if any, is appropriate when the government seeks to use a surveillance device which, on the one hand, can be operated in a manner that will not improperly impinge on individual rights, but, on the other hand, may also be used in an improperly intrusive manner.

In other contexts, courts have concluded that before law enforcement authorities may institute a new enforcement technique that has the potential for unduly impinging on protected rights, the authorities must promulgate regulations directed at confining the use of the technique within proper limits. For example, numerous decisions have required local police departments to establish guidelines for field officers before allowing the departments to set up sobriety checkpoints aimed at apprehending and deterring drunk drivers. (See, e.g., *Stark* v. *Perpich* (D.Minn. 1984) 590 F.Supp. 1057, 1059-1060; *State* ex rel. *Ekstrom* v. *Justice Court* (1983) 136 Ariz. 1 [663 P.2d 992, 1000] (Feldman, J., conc.); *State* v. *Olgaard* (S.D. 1976) 248 N.W.2d 392, 394-395.) And, in a variety of other situations, courts have similarly compelled a supervisory law enforcement entity to promulgate objective standards in order to constrain the free-ranging discretion of law enforcement officers. (See, e.g., *United States* v. *Bryant* (1971) 142 App.D.C. 132 [439 F.2d 642, 652 & fn. 22] [procedures for preservation of evidence gathered in criminal investigation]; *Quad-City Community News Service, Inc.* v. *Jebens* (S.D. Iowa 1971) 334 F.Supp. 8, 17-18 [regulations governing issuance of police press passes]; *Morales* v. *Schmidt* (7th Cir. 1974) 494 F.2d 85, 87-88 (Stevens, J., conc.), 88-89 (Swygert, J., conc.)

[emphasizing need for carefully drawn regulations to govern restrictions on prisoner communications].)

These decisions are in line with the views long expressed by a number of distinguished academic commentators, who have repeatedly emphasized the importance of explicit regulations in controlling the potentially broad discretion exercised by police and other law enforcement personnel. (See, e.g., Amsterdam, *Perspectives on the Fourth Amendment* (1974) 58 Minn.L.Rev. 349, 416-429; McGowan, *Rule-Making and the Police* (1972) 70 Mich.L.Rev. 659; Davis, Administrative Law of the Seventies (1976 supp.) § 4.00-6, pp. 125-126; 3 LaFave, Search and Seizure (1986 supp.) § 10.8, p. 210; ABA Standards Relating to Electronic Surveillance (Approved Draft 1971) § 5.18, p. 26.) Where, as here, potentially overly intrusive surveillance devices may chill protected religious activity, the promulgation of clearly drawn guidelines to limit the misuse of such surveillance tools seems eminently reasonable and appropriate.[2]

As the majority notes, however, there is nothing in the present record to suggest that the correctional authorities have adopted any guidelines establishing minimum threshold levels at which the microphone should generally be set or imposing sanctions on personnel who misuse the security system to eavesdrop on ordinary counseling sessions or religious services in the chapel. From all that appears, such regulations would in no way impinge on the facility's legitimate security interests but would help assure that the system does not unduly intrude on religious freedom.

Under these circumstances, I believe the trial court should properly have enjoined the installation of the listening device, pending the promulgation of adequate regulations limiting the use of the system in a manner that serves the security interest of the facility but that does not unnecessarily intrude on religious services or counseling sessions. Accordingly, I concur in the reversal of the judgment.

**LUCAS, J.**—I respectfully dissent. In the face of evidence disclosing "very serious incidents" of violence occurring in or near the chapel, including "gang confrontations, escapes, sexual attacks on younger, weaker wards, and various contraband problems," and a conceded "objectively reasonable" concern for security in Youth Authority (YA) chapels (*ante,* pp. 696-697), the majority nonetheless effectively requires the YA to dismantle and remove its chapel security monitoring system. The majority, acknowledging its own

---

[2]Of course, the mere promulgation of regulations does not ensure validity; the guidelines embodied in the regulations must still satisfy the relevant statutory and constitutional standards. Once a valid regulation has been adopted, however, particular conduct by individual law enforcement personnel may readily be measured against the established policy.

obvious lack of expertise in the area, offers the YA no reasonable and effective alternatives to the monitoring system presently employed, other than to suggest the "partial solution" of a beeper alarm, coupled with increased use of guards or other YA personnel.[1] (*Ante,* at p. 699.) In my view, such a holding approaches an act of judicial irresponsibility, unnecessarily placing the lives of YA wards and personnel at risk merely because of a remotely possible "chilling effect" upon the conduct of religious services or consultations within the chapel if the sound system is permitted to remain.

In a nutshell, the majority holds that the YA has failed to carry the burden of proving that its sound monitoring system is both "necessary" to preserve reasonable security (see Pen. Code, § 2600) and that the system affords the "least restrictive means" of maintaining that security (*ante,* pp. 697-698). According to the majority, the YA should have made a "more substantial showing that [it] has explored the effectiveness of less intrusive alternatives and found them to be ineffective." (*Ante,* p. 700.) I see many serious problems with this analysis.[2]

First, Penal Code section 2600 deals generally with the civil rights of prisoners, and not with the subject of the exercise of religious freedom by YA wards. That specific topic is governed by section 1705 of the Welfare and Institutions Code, which offers such wards "reasonable opportunities to exercise religious freedom." As the majority acknowledges, this language probably derived from *Cruz* v. *Beto* (1972) 405 U.S. 319 [31 L.Ed.2d 263, 92 S.Ct. 1079], wherein the court held that "reasonable opportunities must be afforded to all prisoners to exercise . . . religious freedom . . . ." (P. 322, fn. 2 [31 L.Ed.2d at p. 268].) The majority likewise concedes that the Legislature *rejected* language which would have granted to YA wards the right to observe religious practices "except as it may become reasonably *necessary* to enforce reasonable, proper, and lawful security measures." (Italics added; see *ante,* p. 684.)

In my view, whatever the phrase "reasonable opportunities" means, it does not mean an absolute guarantee of unmonitored activity *unless* the YA proves a particular security measure is both "necessary" and affords the

---

[1]Use of an FM beeper system had been considered and rejected as inadequate by YA authorities because, among other things, the beeper would not provide information regarding the disturbance nor permit the wearer to communicate with YA staff. Moreover, wards would be unprotected by the beeper unless a staff member happened to be in the vicinity when a problem arose. Thus, the majority's suggestion of a beeper system concededly would also require increased use of guards or other YA personnel.

[2]For the reasons stated in part I of the concurring and dissenting opinion of Justice Grodin, I agree that the YA's new monitoring system does not violate Penal Code section 636.

"least intrusive means" of preserving security. Whatever "reasonable opportunities" are, they were certainly afforded by the YA in the present case.

Factually, this is a poor case to choose as a vehicle for outlawing sound monitoring systems in YA chapels. Here, extensive evidentiary hearings were held, culminating with the trial court's ruling *upholding* the YA's use of its security system. The People submitted evidence of prior acts of violence by YA wards upon teachers, including the 1975 classroom murder of Marie Romero at El Paso de Robles School, and the 1976 brutal assaults upon Tabiri Tabasuri and Gary Cauble, culminating in a riot and $85,000 in property damage. As a result of these incidents, YA employees demanded increased safety and security measures, including more reliable alarm and monitoring systems, and threatened to withhold their services until these measures were carried out.

Not only was there ample evidence introduced of the necessity for sound monitoring, based on prior incidents of violence occurring in or near the chapel, and the inadequacy of a beeper system, but the record also strongly indicates that any interference with, or "chilling effect" upon, religious practices would be minimal. The record shows that no "spying" on religious services or practices, public or private, was involved; the content of private conversations or consultations would not be invaded. The sound system was designed merely to activate when unusually loud sounds occurred, signalling a possible security problem and allowing a rapid response thereto by YA authorities. As R. N. Ristad, president of the Associated Chaplains in State Service, attested: "[T]he electronic sound security system in the chapels at Karl Holton [school] strikes the proper balance between the security needs of the institution and the wards' rights to religious freedom and privacy."

As Presiding Justice Puglia observed in his opinion for the Court of Appeal in this case, "There was evidence in the superior court hearing that the electronic sound system was incapable of monitoring the content of normal conversation conducted in the chaplain's office with the door closed. The superior court impliedly credited such evidence, a factual determination to which we accord great weight in this proceeding [citation]. In any event, respondent [YA] is not constitutionally bound to exempt any particular area of the institution, such as the chaplain's office, from security surveillance. Rather respondent's obligation is to afford petitioners reasonable opportunities to exercise their religious freedom (*Cruz v. Beto, supra,* 405 U.S. at p. 322, fn. 2 [31 L.Ed.2d at p. 268, fn. 2]; Welf. & Inst. Code, § 1705). In respect to participation in confessionals and other private religious activities, any area of the chapel is available for such purposes when the sound system is not operating. Since the sound system can be turned off at the

chaplain's request [subject to the approval of YA authorities] and can thereafter be reactivated only at the chapel, the sanctity of private worship is assured.

"Respondent disavows any intention or desire to deny wards reasonable opportunities to speak in confidence with a religious advisor, and indeed no intrusions upon the privacy of such activities have been alleged or proved. We are satisfied that the electronic monitoring system as proposed will accommodate both institutional security needs and reasonable opportunities for wards to engage in private communications with their religious advisors."

As indicated above, the majority asserts that "it is not this court's job to design security systems . . . ." (*Ante,* p. 700.) Neither, I submit, is it our job to second-guess the YA's decision to install a particular security system, in the absence of any showing of a *substantial* interference with the practice of religion. Certainly, as discussed below, the burden of proving that there are less intrusive alternatives capable of effectively preserving chapel security should be placed on the opponent of the present system, not on the YA. In the absence of some showing that the YA's facially reasonable security device can be effectively replaced with some other system, we should defer to the YA's choice for, indeed, it is not our job to make such decisions.

The majority, assigning to the YA the burden of proof, cites no prison security cases so holding, but merely asserts that "This is consistent with established principles of constitutional law, since fundamental rights of individuals cannot be abridged unless the state shows the abridgement is 'necessary' to further a compelling governmental interest." (*Ante,* p. 697, fn. 34.) First, no "abridgement" is involved here; as indicated above, the sound system will not preclude "reasonable opportunities" (Welf. & Inst. Code, § 1705) to exercise religious freedom. Second, assuming the burden is YA's, it has indeed proven that its system is "necessary" in light of incidents of violence in or near the chapel which demand increased security measures. Finally, the majority overlooks controlling decisions of the United States Supreme Court which completely undermine its unfair assignment of the proof burden to the YA.

In *Bell* v. *Wolfish* (1979) 441 U.S. 520 [60 L.Ed.2d 447, 99 S.Ct. 1861], the high court upheld a prison ban on receipt by inmates of hardbound books unless mailed directly from the publisher or bookstore. Rejecting a claim that the restriction unduly burdened First Amendment rights of the inmates, the court first observed that the "limited restriction is a rational response by prison officials to an obvious security problem." (P. 550 [60 L.Ed.2d

at p. 476].) With respect to the burden of proof question, the court noted that "There is simply *no evidence in the record to indicate that [prison] officials have exaggerated their response* to this security problem and to the administrative difficulties posed by the necessity of carefully inspecting each book mailed from unidentified sources. Therefore, the considered judgment of these experts must control in the absence of prohibitions far more sweeping than those involved here. [Citations.] [¶] Our conclusion that this limited restriction on receipt of hardback books does not infringe the First Amendment rights of . . . inmates is influenced by several other factors. The rule operates in a neutral fashion, without regard to the content of the expression . . . . And there are alternative means of obtaining reading material *that have not been shown to be burdensome or insufficient.*" (*Id.,* at p. 551 [60 L.Ed.2d at p. 476], italics added; see also *Jones* v. *North Carolina Prisoners' Union* (1977) 433 U.S. 119, 128 [53 L.Ed.2d 629, 640, 97 S.Ct. 2532]; *Pell* v. *Procunier* (1974) 417 U.S. 817, 827-828 [41 L.Ed.2d 495, 504-505, 94 S.Ct. 2800].)

Thus, in *Bell,* a prison's limited infringement upon a First Amendment right was deemed a rational response to an obvious security problem, in the absence of proof *by the inmates* that the response was "exaggerated" (i.e., was not the least intrusive means reasonably available). In my view, *Bell* and its predecessors are controlling here. The majority, describing the foregoing United States Supreme Court precedent as "a few federal cases," rejects that precedent because it would "merely" require prison officials to show that chosen security measures are rationally related to security concerns, rather than proving that such measures provide the "least drastic means of addressing those concerns." (*Ante,* p. 691.) But as I have explained, nowhere in the applicable constitutional or statutory provisions is such an unrealistic burden imposed on prison officials.

The majority concludes that "to remain true to the legislative intent of [Penal Code] section 2600, the balancing analysis must begin with a discussion of the rights of nonconfined citizens. [Citations.]" (*Ante,* p. 691, fn. omitted.) But YA wards, like prisoners, are not "nonconfined citizens," and cases discussing the scope of First Amendment or other fundamental rights in the context of a free and open society are simply inapposite.

As the United States Supreme Court stated in *Jones* v. *North Carolina Prisoners' Union, supra,* 433 U.S. at pages 132-133, footnote 9 [53 L.Ed.2d at p. 643] "informed discretion of prison officials that there is a potential danger may be sufficient for limiting rights even though this showing might be 'unimpressive if . . . submitted as justification for governmental restriction of personal communication among members of the general public.'" As stated by Justice Richardson in his opinion in *In re Cummings* (1982)

30 Cal.3d 870, 873 [180 Cal.Rptr. 826, 640 P.2d 1101, 29 A.L.R.4th 1207], "Rights of privacy, like associational rights, are necessarily and substantially abridged in a prison setting." Nothing in the majority opinion, or in the language of the applicable statutes, indicates that the exercise of religious freedom must be treated any differently.

For all the foregoing reasons, I dissent from the majority opinion and would not order the YA to remove its electronic sound system.

Mosk, J., concurred.