[No. C066452. Third Dist. Jan. 11, 2012.]

In re MARGARITO JESUS GARCIA on Habeas Corpus.

COUNSEL

Linnea M. Johnson, under appointment by the Court of Appeal, for Petitioner Margarito Jesus Garcia.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Jessica N. Blonien and David N. Sunada, Deputy Attorneys General, for Respondent The People.

OPINION

**HULL, J.**—Petitioner Margarito Jesus Garcia, a prison inmate subject to the custody and control of California's Department of Corrections and Rehabilitation (CDCR), filed a petition for writ of habeas corpus challenging the denial of his request to participate in an existing kosher meals program. Petitioner contends his religion, Messianic Judaism, requires that he maintain a kosher diet, and the denial of his request violates his First and Fourteenth Amendment rights as well as the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA). (42 U.S.C. § 2000cc et seq.)

We conclude that, under the circumstances presented, prison officials are in violation of petitioner's statutory rights under RLUIPA. Prison officials

have not disputed either the sincerity of petitioner's religious beliefs or the requirement that he maintain a kosher diet. Nor have they demonstrated the burden imposed on petitioner's religious beliefs by virtue of his exclusion from the kosher meals program furthers a compelling governmental interest and is the least restrictive means of furthering that interest, as required by RLUIPA. In light of the foregoing conclusion, it is unnecessary to address petitioner's constitutional claims.

## FACTS AND PROCEEDINGS

Petitioner is an inmate of the CDCR who, at the time of the petition herein, was housed at Mule Creek State Prison in Ione, California (Mule Creek). On July 27, 2009, petitioner submitted a CDCR form requesting to participate in Mule Creek's Jewish kosher diet program (JKDP). On the form, petitioner identified his religion as Messianic Judaism and indicated he had been practicing the religion for the prior two years. He also identified the following dietary law to which he must adhere: "According to the Torah, I am not allowed to eat meat with blood in it, and I am not allowed to eat foods that are mixed with unclean food."

Petitioner's request was denied by Mule Creek's Jewish chaplain, Rabbi Korik. As the basis for the denial, Korik explained: "Inmate Garcia has confirmed during the interview that he does not practice Judaism, rather the messianic belief. Per JKDP regulations only inmates practicing Judaism as their sincerely held belief may be approved for the JKDP."

Petitioner filed an administrative appeal, which was denied. He thereafter exhausted his administrative remedies and, at each step, the denial was upheld. At no time during this process did prison officials question the sincerity of petitioner's beliefs or the requirement that he adhere to a kosher diet.

Petitioner filed a petition for writ of habeas corpus in the superior court, which was denied. He then filed a petition for writ of habeas corpus in this court. We issued an order to show cause returnable in the superior court. (*In re Garcia* (May 3, 2010, C064186) [order to show cause issued].)

Petitioner presented a declaration in the superior court affirming his commitment to Messianic Judaism. Petitioner stated: "One tenet of the Messianic Jewish faith pertains to diet, and while not all Messianic Jews keep kosher, I have embraced this tenet and sincerely wish to follow a kosher diet." Petitioner explained Mule Creek does not currently have a Messianic rabbi, but he averred that he met weekly with other Messianic inmates to study and pray. Petitioner also noted: "I do wish to convert formally to the Messianic Jewish faith, but I currently consider myself to be a Messianic Jew, and this belief is sincere."

Petitioner also submitted correspondence concerning the Messianic Jewish faith and other documentation, including a publication from the State of Washington, Department of Corrections. (State of Wn., Dept. of Corrections, Handbook of Religious Beliefs and Practices (rev. 2d ed. 2004) (Washington Handbook).) The Washington Handbook explains: "Messianic Judaism (MJ) is the religion of the followers of Yeshua (Jesus) who desire to recover the Hebrew roots of their faith, worshipping and living in accordance with the Torah (Law) of Moses as taught by Yeshua and His disciples. In the 1st Century CE (AD), MJ was one of the many sects of Judaism. As such, it adheres to many of the tenants [*sic*] and practices of ancient Judaism." (*Id.* at p. 35.)

With regard to diet, the handbook explains: "MJ groups observe various degrees of kosher eating. The more strict groups follow a traditional rabbinic kosher diet . . . . Where strict kosher diet is being observed, the highest kosher symbols (those of the Orthodox) should be used since these are the most consistent and reliable." (Washington Handbook, *supra*, at p. 44.) The Washington Handbook describes some of the specific kosher rules in more detail, noting: "The kosher food laws are given in Leviticus and Deuteronomy. Only meat from kosher animals is permitted. These are those that chew the cud and have divided hooves (e.g., cows, goats, sheep, etc.). Kosher fowl are primarily those which are not birds of prey (e.g., chickens, ducks, geese, turkeys). Kosher meat must be slaughtered in such a way as to allow the blood to be entirely drained off. Meat which contains blood is not kosher. Kosher seafood are from fish that have scales and fins. All other seafood is non-kosher (e.g., lobster, crab, and all shellfish). All vegetables and fruit are kosher." (*Ibid.*)

The superior court denied the petition.

Petitioner then filed the current petition in this court. On January 28, 2011, we issued an order to show cause returnable before this court to respondent Michael Martel, Warden of Mule Creek. Respondent filed a return on February 28, 2011, and petitioner filed a traverse on March 30, 2011.

After respondent filed its return, petitioner was transferred to Ironwood State Prison in Blythe, California. Petitioner advised this court of the transfer. Respondent filed a motion to dismiss the petition as moot in light of the transfer. We denied the motion. Petitioner provided this court with documentation, of which we took judicial notice, indicating the rabbi at his current institution denied a request by petitioner to participate in the JKDP there because petitioner "is not compliant with traditional Judaism for which the Kosher Program was established."

Respondent submitted three declarations with its return. The first is from L. Maurino, the departmental food administrator of the CDCR. Maurino is

familiar with the dietary programs at the adult institutions of the CDCR, has personal knowledge of the construction, development, and administration of the meal programs and policies, and is a registered dietician. Maurino identifies the following CDCR food programs: (1) a pork-free meal program, (2) a vegetarian meal program, (3) a religious meat alternate program, and (4) the JKDP. The JKDP requires certification by a rabbi, separate utensils, dishes, and storage to ensure no contact between meat and dairy foods, and assembly in a separate kitchen area by trained staff.

According to Maurino, 684 inmates participate in the JKDP throughout the 33 California prisons. Maurino states: "The current budgeted food cost per inmate is $2.90 a day for the regular meals, $2.62 for the Vegetarian Meal Program, and $3.20 for the Religious Meat Alternate Program. The cost of the [JKDP] is approximately $7.97 per inmate per day. Because of the smaller number of participants in the [JKDP], the higher cost of this food program can be absorbed in the food budget." Maurino opines: "A prospective increase in the numbers of inmates participating in the kosher meal program would require more preparation space, more storage areas, increased training and supervision of cooks, and more equipment, labor, and time devoted for food preparation. As such, the department's food budget would be significantly burdened if even a small percentage of other non-Jewish religious groups were allowed to receive kosher meals." Maurino also asserts there are approximately 5,000 inmates who self-identify as Muslim in state prison and 1,200 inmates who self-identify as Pagans or other nontraditional, non-Jewish groups, including (but not limited to) Odinists and the House of Yahweh. Maurino indicates he is "aware that inmates representing these religious groups" have asked to participate in the JKDP.

A similar declaration was submitted by J. Yates, the assistant correctional food manager at Mule Creek. Yates asserts that 43 of approximately 3,600 inmates at Mule Creek receive kosher meals. Kosher meals are purchased from a vendor "as either prepackaged shelf-stable entrees or frozen entrees." At Mule Creek, kosher meals are prepared in a separate kitchen used solely for that purpose. Breakfast and lunch kosher meals are delivered the previous evening, served cold, and distributed at breakfast. Dinner meals are heated in separately designated microwave ovens and delivered hot. Inmates who receive kosher meals use kosher meal cards, go through the general population feeding lines, present their cards at the serving window, and are given their kosher meals.

Yates indicates items such as vegetables, fruit, and salad are provided with kosher meals. When a salad is prepared in the kitchen, it too must be kosher certified using procedures specified by a rabbi, including separate pans, utensils, and a specially designated area. Yates explains: "This remains

feasible because of the relatively small number of inmates participating in the [JKDP]." According to Yates: "If the number of inmates who receive kosher meals increase[s], the situation would create staffing, training, and supervision problems. The necessary procedures and precautions that are involved in preparing kosher food compel[] prison authorities to require more supervision of staff and inmate workers to prevent ritual contamination and sabotage. Further, unlike Mule Creek, most prisons do not have a separate kosher kitchen, but have at best, a designated microwave and separate food preparation area for kosher food. Even a modest increase in the number of participants, would require increased storage, more staffing, increased training of new workers, and strain already limited resources allotted for the program."

Yates notes that kosher food is much desired by non-Jewish inmates because it is perceived as better tasting and of higher quality. He explains: "The kosher program offers items that are not offered in the other inmate meal programs such as honey, and whole, uncut fruits and vegetables. Thus, Jewish kosher meal items are frequently stolen to be consumed, bartered, or sold as contraband. Even with the relatively small number of participants in the kosher meal program, theft prevention, inventory control, and associated custody problems with contraband are ongoing problems. This problem would be greatly exacerbated if the kosher meal program was expanded to include other non-Jewish inmates."

Finally, respondent submitted a declaration by Rabbi Grossbaum, the current rabbi at Mule Creek. Rabbi Grossbaum states: "Though Messianic Judaism claims to be a part of Judaism, the belief of Messianic Jews that a messiah has already arrived is contrary to the beliefs and practices of Judaism. However, it is my understanding that Messianic Jews study the Torah, and attempt to adhere, in whole or in part, to the tenets and practices of ancient Judaism." He further states: "An inmate who wants to participate in the [JKDP] must be a Jew and/or demonstrate a commitment to Judaism through religious study, attendance at services and an attempt to live and apply Jewish practices into his daily life as an inmate. Conversion is not necessarily required to receive a kosher meal. To the best of my knowledge, [petitioner] has not availed himself of those opportunities or otherwise attempted to qualify to participate in the [JKDP]. And to the extent that [petitioner] proclaims [himself] to be a Jew, albeit a messianic Jew, requiring him to commit to a study of Jewish religious texts, attendance at services, and integrating Jewish practices into his life to qualify to participate in the kosher meal program, would not appear to violate or repudiate his beliefs."

DISCUSSION

I

*Motion to Strike*

Petitioner has filed a motion to strike Rabbi Grossbaum's declaration, claiming Grossbaum is not legally competent (1) to testify concerning theology, practices and tenets of Messianic Judaism; (2) to opine concerning what normative Jewish practices would violate or repudiate petitioner's Messianic Jewish beliefs; (3) to offer religious counseling on Messianic Judaism; (4) to offer evidence that petitioner has not availed himself of opportunities to attend traditional Jewish services; or (5) to testify concerning any reasons petitioner was denied participation in the JKDP.

Petitioner argues Rabbi Grossbaum's declaration does not provide any evidence relative to this matter, because there is nothing to indicate he was the rabbi at Mule Creek at the times relevant to this dispute or has personal knowledge of the circumstances surrounding the denial of petitioner's request to participate in the JKDP. Petitioner further argues respondent has failed to establish Rabbi Grossbaum's expertise in Messianic Judaism.

We deny petitioner's motion to strike. Although we agree some of petitioner's points may be well taken, we find Rabbi Grossbaum's declaration contains relevant information as to how the CDCR has implemented the JKDP and what petitioner is required to do in order to be admitted to the program. Thus, while certain portions of Rabbi Grossbaum's declaration may not be relevant to this dispute, and we do not consider those portions in reaching our conclusions herein, we do not find the entirety of the declaration to be irrelevant or that any lack of expertise in Messianic Judaism detracts from this relevance.

II

*Availability of Habeas Corpus Relief*

In his return, respondent contends habeas corpus relief is unavailable under the circumstances of this case, because petitioner has an adequate remedy at law through a civil action in federal court to enforce RLUIPA. However, at oral argument, respondent conceded a claim under RLUIPA can be adjudicated in a state habeas corpus proceeding. We accept this concession.

In California, habeas corpus is broadly used to remedy violations of inmates' rights while in confinement, including challenges to the conditions

of confinement. (See *In re Bittaker* (1997) 55 Cal.App.4th 1004, 1010 [64 Cal.Rptr.2d 679].) There is a presumption that state courts have concurrent jurisdiction with federal courts over federal claims: "In considering the propriety of state-court jurisdiction over any particular federal claim, the Court begins with the presumption that state courts enjoy concurrent jurisdiction. [Citations.] Congress, however, may confine jurisdiction to the federal courts either explicitly or implicitly. Thus, the presumption of concurrent jurisdiction can be rebutted by an explicit statutory directive, by unmistakable implication from legislative history, or by a clear incompatibility between state-court jurisdiction and federal interests." (*Gulf Offshore Co. v. Mobil Oil Corp.* (1981) 453 U.S. 473, 478 [69 L.Ed.2d 784, 791, 101 S.Ct. 2870].)

■ Under RLUIPA, a cause of action may be asserted "in a judicial proceeding" against "a government" (42 U.S.C., § 2000cc-2(a)), and adjudication of such cause of action will be given full faith and credit provided the "claimant had a full and fair adjudication of that claim in the non-Federal forum." (*Id.*, § 2000cc-2(c).) We interpret the foregoing language to infer that Congress meant for state courts to hear causes of action based on RLUIPA. There is also no clear incompatibility between state-court jurisdiction and federal interests. This factor of concurrent jurisdiction requires consideration of the "desirability of uniform interpretation, the expertise of federal judges in federal law, and the assumed greater hospitality of federal courts to peculiarly federal claims." (*Gulf Offshore Co. v. Mobil Oil Corp., supra,* 453 U.S. at pp. 483–484 [69 L.Ed.2d at p. 795].) While uniformity in interpretation and application of any statute is desirable, there is nothing so peculiar about a religious freedom claim brought by an institutionalized person that warrants a conclusion that only the federal courts should entertain them under RLUIPA.

■ Penal Code section 1473, subdivision (a), provides: "Every person unlawfully imprisoned or restrained of his liberty, under any pretense whatever, may prosecute a writ of habeas corpus, to inquire into the cause of such imprisonment or restraint." Subdivision (d) of Penal Code section 1473 reads: "Nothing in this section shall be construed as limiting the grounds for which a writ of habeas corpus may be prosecuted or as precluding the use of any other remedies." The function of habeas corpus "has evolved from the traditional remedy for release of a prisoner to include a declaration of rights of a prisoner not entitled to outright release. [Citations.] The writ of habeas corpus may be used to secure fundamental rights of a person lawfully in custody." (*In re Brindle* (1979) 91 Cal.App.3d 660, 669 [154 Cal.Rptr. 563]; see *In re Riddle* (1962) 57 Cal.2d 848, 851 [22 Cal.Rptr. 472, 372 P.2d 304] [writ of habeas corpus can be used to protect "fundamental basic rights" of prisoners].) More recent cases have dropped the limitation to "fundamental" rights, stating that the writ of habeas corpus can be used by inmates to address a deprivation of their "rights" while in confinement. (See *In re Arias*

(1986) 42 Cal.3d 667, 678 [230 Cal.Rptr. 505, 725 P.2d 664], abrogated by statute on another point as recognized in *Thompson v. Department of Corrections* (2001) 25 Cal.4th 117, 130 [105 Cal.Rptr.2d 46, 18 P.3d 1198]; *In re Davis* (1979) 25 Cal.3d 384, 387 [158 Cal.Rptr. 384, 599 P.2d 690].)

■ We conclude petitioner's RLUIPA claim may be adjudicated in this habeas corpus proceeding and that a violation of RLUIPA may be the basis for habeas corpus relief.

## III

### *Petitioner's RLUIPA Claim*

In his petition for writ of habeas corpus in this court, petitioner asserts the denial of his request to participate in the JKDP violates his rights under RLUIPA. Petitioner also asserts such denial violates his First Amendment right to practice his religion and his Fourteenth Amendment right to equal protection.

■ "A fundamental principle of constitutional adjudication is that a court will not decide constitutional questions unless absolutely required to do so to dispose of the matter before the court, which means we will not reach constitutional questions where other grounds are available and dispositive of the issues of the case. (*Lyng v. Northwest Indian Cemetery Prot. Assn.* (1988) 485 U.S. 439, 445 [99 L.Ed.2d 534, 544, 108 S.Ct. 1319]; *Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 230–231 [45 Cal.Rptr.2d 207, 902 P.2d 225]; *Matrixx Initiatives, Inc. v. Doe* (2006) 138 Cal.App.4th 872, 881 [42 Cal.Rptr.3d 79].)" (*Teachers' Retirement Bd. v. Genest* (2007) 154 Cal.App.4th 1012, 1043 [65 Cal.Rptr.3d 326].) "[T]he appropriate exercise of judicial power requires that important constitutional issues not be decided unnecessarily where narrower grounds exist for according relief." (*Communist Party of Indiana v. Whitcomb* (1974) 414 U.S. 441, 451, fn. 1 [38 L.Ed.2d 635, 644, 94 S.Ct. 656] (conc. opn. of Powell, J.).) At oral argument, the parties agreed this matter should be resolved, if possible, on statutory rather than constitutional grounds.

In support of his RLUIPA claim, petitioner relies on the traverse he filed in support of his petition in the superior court. On page 3 of that traverse, petitioner asserted "CDCR has failed to show how refusing to provide Petitioner with a kosher diet serves a compelling state interest . . . ." He further asserted the denial of his participation in the JKDP "has substantially burdened the exercise of his religion." The traverse contains 11 pages of argument as to why petitioner's exclusion from the JKDP violates RLUIPA.

In his return to the petition, respondent asserts: "[Petitioner] cannot raise his RLUIPA claim in habeas corpus; rather he must raise the claim in a separate civil proceeding as provided by statute. Even so, respondent denies that [petitioner]'s rights under RLUIPA have been violated because prison officials have not substantially burdened his exercise of religion." However, except for arguing the unavailability of habeas corpus relief because of an adequate remedy in federal court, as discussed above, respondent included no argument in his return as to why petitioner has not stated a valid claim under RLUIPA. The bulk of the return addresses petitioner's First Amendment claim, with approximately one page dedicated to the equal protection challenge.

At oral argument, respondent asserted the refusal to allow petitioner to participate in the JKDP did not interfere with the practice of his religion because he is not a Jew and because a vegetarian diet is available to petitioner that would satisfy his religious requirements. As we shall explain, these arguments are not persuasive.

"RLUIPA is the latest of long-running congressional efforts to accord religious exercise heightened protection from government-imposed burdens, consistent with [United States Supreme Court] precedents. Ten years before RLUIPA's enactment, the Court held, in *Employment Div., Dept. of Human Resources of Ore* v. *Smith*, 494 U.S. 872, 878–882 [108 L.Ed.2d 876, 110 S.Ct. 1595] (1990), that the First Amendment's Free Exercise Clause does not inhibit enforcement of otherwise valid laws of general application that incidentally burden religious conduct. . . .

"Responding to *Smith*, Congress enacted the Religious Freedom Restoration Act of 1993 (RFRA), 107 Stat. 1488, 42 U.S.C. § 2000bb *et seq*. RFRA 'prohibits "[g]overnment" from "substantially burden[ing]" a person's exercise of religion even if the burden results from a rule of general applicability unless the government can demonstrate the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." ' . . . In *City of Boerne* [*v. Flores* (1997) 521 U.S. 507 [138 L.Ed.2d 624, 117 S.Ct. 2157]], [the United States Supreme Court] invalidated RFRA as applied to States and their subdivisions, holding that the Act exceeded Congress' remedial powers under the Fourteenth Amendment. *Id.*, at 532–536 [138 L.Ed.2d 624, 117 S.Ct. 2157].

"Congress again responded, this time by enacting RLUIPA. Less sweeping than RFRA, and invoking federal authority under the Spending and Commerce Clauses, RLUIPA targets two areas: Section 2 of the Act concerns land-use regulation, 42 U.S.C. § 2000cc; § 3 relates to religious exercise by

institutionalized persons, § 2000cc-1." (*Cutter v. Wilkinson* (2005) 544 U.S. 709, 714–715 [161 L.Ed.2d 1020, 1030, 125 S.Ct. 2113], citation omitted, fns. omitted (*Cutter*).)

■ Title 42 United States Code section 2000cc-1, part of RLUIPA, provides in part: "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—[¶] (1) is in furtherance of a compelling governmental interest; and [¶] (2) is the least restrictive means of furthering that compelling governmental interest." (42 U.S.C. § 2000cc-1(a).) Unlike cases arising under the First Amendment, the foregoing prohibition applies even where the burden placed on a prisoner's religious freedom results from a rule of general applicability. (*Koger v. Bryan* (7th Cir. 2008) 523 F.3d 789, 796.)

■ In pursuing a claim under RLUIPA, "the plaintiff bears the initial burden of showing (1) that he seeks to engage in an exercise of religion, and (2) that the challenged practice substantially burdens that exercise of religion. 42 U.S.C. § 2000cc-2(b). Once the plaintiff establishes this prima facie case, the defendants 'bear the burden of persuasion on any [other] element of the claim,' *id.*, namely whether their practice 'is the least restrictive means of furthering a compelling governmental interest.' [Citation.]" (*Koger v. Bryan, supra*, 523 F.3d at p. 796.)

In *Cutter*, the United States Supreme Court rejected a facial challenge to RLUIPA. However, in doing so, the court cautioned: "We have no cause to believe that RLUIPA would not be applied in an appropriately balanced way, with particular sensitivity to security concerns. While the Act adopts a 'compelling governmental interest' standard, [citation], '[c]ontext matters' in the application of that standard. [Citation.] Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions. [Citation.] They anticipated that courts would apply the Act's standard with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.' [Citation.]" (*Cutter, supra*, 544 U.S. at pp. 722–723 [161 L.Ed.2d at p. 1035], fns. omitted.)

In the present matter, respondent does not argue the rejection of petitioner's request to participate in the JKDP furthers a compelling governmental interest and is the least restrictive means of doing so, as required by RLUIPA. We are not surprised. On this record, we fail to see any legitimate governmental interest, let alone a compelling interest, in allowing traditional Jews to

receive kosher meals but denying the same accommodation to Messianic Jews who sincerely hold similar beliefs concerning diet. Respondent points to evidence they have offered concerning the resources devoted to the kosher meal program, the difficulty in setting aside space and ensuring proper training and administration of the program, and security and custodial concerns. However, CDCR has determined that kosher meals can be provided in a cost-effective manner to Jewish inmates. Implicit in that determination is the judgment that providing kosher meals is not currently cost prohibitive.

As for whether expanding the program to include petitioner would harm prison administration, respondent fails to make any showing of how many inmates, like petitioner, practice Messianic Judaism and wish to participate in the JKDP. The reference to a broad group of others in prison, in Maurino's declaration, is entirely inapposite, considering that respondent does not identify particular groups whose religious beliefs are tied to kosher rules. In the absence of such evidence, we cannot conclude either that the JKDP will be overwhelmed or that a limited extension to include petitioner would place a significant strain on prison resources.

Because respondent does not attempt to establish that excluding petitioner from participation in the JKDP furthers a compelling governmental interest in the least restrictive way, any concerns expressed in *Cutter* regarding prison security and limited resources have no bearing on this dispute.

At oral argument, respondent asserted the denial of petitioner's request to participate in the JKDP did not interfere with the exercise of his religion because he is not a Jew, as defined by the rabbi at Mule Creek, i.e., is not a traditional Jew, and petitioner's dietary requirements can be met through a vegetarian diet.

The fact that petitioner is not a traditional Jew as determined by the local Jewish rabbi is an artificial construct that has no bearing on the issue presented. CDCR regulations for the JKDP limit participation to traditional Jewish inmates "as determined by a Jewish Chaplain." (Cal. Code Regs., tit. 15, § 3054.2, subd. (a).) However, those regulations might just as readily have opened participation to all Jews or to all non-Christians or limited participation to Jews with red hair. RLUIPA prohibits imposition of a substantial burden on an inmate's religious exercise. (42 U.S.C. § 2000cc-1(a).) "Religious exercise" includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." (42 U.S.C. § 2000cc-5(7).) The issue here is not whether petitioner is a Jew but whether his system of religious beliefs includes maintaining a kosher diet.

In a declaration attached to the traverse submitted to the superior court, which is attached to the petition in this matter, petitioner asserted he

considers Messianic Judaism to be his religion and "[o]ne tenet of the Messianic Jewish faith pertains to diet, and while not all Messianic Jews keep kosher, I have embraced this tenet and sincerely wish to follow a kosher diet."

As noted earlier, respondent has never challenged this assertion by petitioner or the sincerity of his claim that maintaining a kosher diet is a part of his system of religious beliefs. Respondent instead insists petitioner's religious needs can be met by a vegetarian diet. But petitioner has consistently stated that he wants to follow a kosher diet consistent with the Torah and his religious beliefs. Respondent's own evidence reflects the differences in preparation of kosher meals from nonkosher meals, indicating that neither the pork-free nor the vegetarian option is consistent with a traditional kosher diet. Kosher food must be prepared in a separate area with separate pans, utensils, dishes, and storage.

In any event, the availability of an alternate diet was not the basis for petitioner's exclusion from the JKDP. Throughout the administrative process, respondent rejected petitioner's request and various administrative appeals solely because he is not a traditional Jew. Thus, the issue of whether petitioner's religious requirements can be met with a vegetarian diet was not litigated. On the record before us, there is no basis whatsoever to conclude petitioner's system of religious beliefs does not include maintaining a kosher diet and this can be satisfied with a vegetarian diet.

We conclude respondent's denial of petitioner's request to participate in the JKDP violates petitioner's rights under RLUIPA. To the extent prison policy and regulations permit such action, they cannot stand. We emphasize, however, that our decision in this regard is based on the procedural and factual posture of this matter. Respondent has made no attempt to challenge petitioner's assertions regarding his religious beliefs or his claim that maintaining a kosher diet is an integral part thereof. Respondent already has in place a kosher diet program and has not established a compelling interest in restricting that program to traditional Jews. Under these circumstances, petitioner's exclusion from the JKDP violates his rights under RLUIPA.

Having so concluded, we need not and do not consider petitioner's constitutional challenges.

## DISPOSITION

The petition for writ of habeas corpus is granted. The Department of Corrections and Rehabilitation is directed to permit petitioner to participate in its existing kosher meals program, as described in title 15, section 3054.2 of

the California Code of Regulations. In the event such program is not available at the institution in which petitioner is currently being held, and petitioner's CDCR classification otherwise permits it, the Department of Corrections and Rehabilitation is directed to transfer petitioner to an appropriate institution where a kosher meals program is available.

Blease, Acting P. J., and Mauro, J., concurred.